IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 25, 2003 Session

## STATE OF TENNESSEE v. ROBERT MICHAEL WINTERS

**Appeal from the Criminal Court for Hamilton County**
**No. 231247     Rebecca J. Stern, Judge**

_____

**No. E2002-00160-CCA-R3-CD**
**November 7, 2003**
_____

Robert Michael Winters appeals his Hamilton County convictions of first-degree murder and aggravated robbery relative to events which culminated in the death of Vernise Sheffield, for which the defendant is serving concurrent sentences of life with the possibility of parole and 12 years, respectively. In this direct appeal, Winters alleges that his convictions are unsupported by sufficient evidence, that the trial court erroneously instructed the jury on criminal responsibility, that the trial court erroneously admitted a letter from the defendant to his wife which was properly subject to the marital communications privilege, and that the trial court erroneously admitted a prior consistent statement to rehabilitate a state's witness. Because we are unconvinced that harmful error occurred, we affirm the defendant's first-degree felony murder and aggravated robbery convictions. However, instructional error with respect to the first-degree premeditated murder conviction requires that we reverse that count and remand for a new trial.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Reversed in Part and Affirmed in Part.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Philip L. Duval and Melanie Snipes, Chattanooga, Tennessee, for the Appellant, Robert Michael Winters.

Paul G. Summers, Attorney General & Reporter; Peter M. Coughlin, Assistant Attorney General; William H. Cox, III, District Attorney General; and Lila Statom and Dean Ferraro, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

On the evening of April 28, 1997, Vernise Sheffield was killed in his home by a single gunshot wound to the head. The victim was known to have weekly held large amounts of cash on his person from the collection of rent at the apartment complex he owned. The question whether

the defendant killed the victim, either himself or via facilitation of his confederates was resolved by jury verdict against the defendant.

The trial evidence in the light most favorable to the state demonstrated that at the time of the crimes, the defendant and his wife, Trudy Winters, were living a hand-to-mouth existence marked by drug abuse and the quest for money to purchase drugs. The Winters lived in an efficiency apartment which they rented weekly from the victim, who owned and resided in the complex where the crimes occurred. Both the defendant and his wife worked at least sporadically in the construction industry. In addition to revenues obtained through construction-related employment, the defendant on occasion pawned various items of personalty for cash. Furthermore, according to Mrs. Winters, the couple stole items from department stores which they then sold for cash.

The Winters did not own an operational vehicle in late April 1997, and they relied upon acquaintances to transport them, among whom was Bo Campbell. Mr. Campbell periodically transported the Winters for the purpose of obtaining drugs, and his payment for providing this service typically consisted of a share of the drugs.

According to Mrs. Winters and Bo Campbell, both of whom testified for the state as part of an agreed disposition of pending charges, the Winters and Campbell had agreed to carry out a plan whereby the defendant was to meet a drug dealer on the evening of April 28, 1997 under the pretext of selling a quantity of drugs to the dealer for $3,000, although in actuality the defendant would have no drugs and was to flee out the window of his apartment with the money. By all accounts, no such transaction ever actually took place.

Trudy Winters provided what was perhaps the most damaging testimony against the defendant. She recounted that on April 28, the defendant told her to pack up their belongings, as they would be leaving Chattanooga after robbing a drug dealer of $3,000. After loading the Winters' belongings into Bo Campbell's van and injecting cocaine, the Winters and Campbell drove around that evening and eventually parked behind Northside Inn, the apartment complex where they had been living. At approximately 8:15 p.m., the defendant left the van and went down the hill to the complex. About 8:35 p.m., Mrs. Winters heard a gunshot. She went down the hill to see about the defendant, and when she returned to the van, the defendant was already inside. The trio drove to a nearby bar, where the defendant used a pay telephone. From her vantage point in the van, Mrs. Winters saw the defendant talking on the phone. However, she noticed that he retrieved change from the phone after the apparent phone call. The defendant returned to the van and told Mrs. Winters and Campbell that the drug dealer was to meet him in approximately 30 minutes. Campbell gave the defendant a small handgun. The defendant set out on foot in the direction of Northside Inn.

Half an hour to 45 minutes later, the defendant returned. He was pale and appeared to be scared. He gave the handgun to Campbell, who wiped it with a rag. The defendant had cash, whereas he had not had any cash earlier in the evening. The trio went to a store and purchased gas and cigarettes. They then went to another part of the city and purchased cocaine. The Winters discussed where they would spend the night. Mrs. Winters wanted to return to their room at

Northside Inn, but the defendant was adamant that he did not want to go there. Instead, they checked into the Cherokee Motel. Campbell came inside the motel long enough to use the drugs that had been purchased, and then he left. Before the Winters went to sleep that evening, the defendant told Mrs. Winters, "No matter what happens, just remember I always love you."

The next morning, Campbell returned to the Cherokee Motel at 6:30 or 7:00. A woman who Mrs. Winters did not know accompanied him. The Winters again disagreed over whether they would return to Northside Inn. Campbell took Mrs. Winters back to that location, and the foursome unloaded the Winters' belongings back into their room. The defendant, who had not wanted to return to Northside Inn, retrieved some leather jackets and leather boots and left, saying that he was going to pawn the items. Later that day, Mrs. Winters paged the defendant, and when she spoke with him, she related that their landlord had been shot. The defendant returned to Northside Inn at 4:00 or 5:00 that afternoon.

Although her extent of actual involvement was not clear, Mrs. Winters acknowledged that she and the defendant had resorted to forging checks that had been stolen from Glenn Lee. She testified about one in particular that the defendant had written to Mrs. Winters with Mr. Lee's forged signature, which the defendant then had the victim "cash." The check was not honored after the victim presented it. The defendant told Mrs. Winters that the victim had "hollered" at him about the check bouncing. This took place in the week preceding the victim's homicide.

Mrs. Winters testified that Bo Campbell is about 6'2" or 6'3", has dark skin, and has salt-and-pepper hair.

Mrs. Winters' testimony was riddled with internal inconsistencies and conflicted in many respects with prior statements she had given to law enforcement officers. The defense successfully highlighted many of these variances and mounted a vigorous attack on the witness's credibility. Mrs. Winters admitted that she had four prior theft convictions. Mrs. Winters also admitted that she was testifying as part of an immunity agreement with the state.

As was the testimony of Trudy Winters, Bo Campbell's testimony was also very damaging to the defense. He admitted that he exchanged transportation services with the Winters for drugs and gasoline. He likewise admitted that he had been party with the Winters to a plan conceived by the defendant whereby they would stage a phony drug transaction in order to steal $3,000 from the drug dealer. The trio would then take the money to Florida, purchase drugs, and return to Chattanooga to sell the drugs. The plan called for Campbell and Mrs. Winters to sit behind Northside Inn while the defendant consummated the purported transaction, then run into his apartment and out the back window to the getaway vehicle in which Mrs. Winters and Campbell were waiting. After the defendant expressed a desire for a gun, Campbell provided him with one which he was keeping for his sister-in-law.

According to Campbell, he went to Northside Inn about 6:00 on the evening of April 28. He and the Winters loaded the Winters' belongings into his van. The defendant stayed at the

apartment to call the drug dealer and await his arrival, while Campbell and Mrs. Winters drove behind Northside Inn in Campbell's van, parked in a driveway, and sat and waited. After a while, Campbell became concerned that someone would become suspicious of them and call the authorities, so he drove down the road and back. Between 8:00 and 9:00 p.m., Campbell and Mrs. Winters heard a gunshot. Mrs. Winters was alarmed and feared that the defendant had been shot. She jumped out of the van and ran in the direction of Northside Inn. Shortly, as Campbell began moving the van, the defendant and then Mrs. Winters came up the hill from Northside Inn. The defendant told Campbell that he was doing a trial run for the theft from the drug dealer and dropped the gun while practicing climbing out his window, which caused the gun to fire.

Campbell testified that the trio drove to a nearby tavern, where the defendant used the phone while Mrs. Winters and Campbell waited in the van. After making a couple of phone calls, the defendant said that "the guy was already there" and departed on foot for Northside Inn around 9:00 p.m. The defendant had the gun with him when he left. Within ten minutes, the defendant came running back. As he got into the van, the gun fell on the floor, and Campbell picked it up. The defendant said the drug dealer had a second man with him, and the dealer had accused the defendant of "trying to rip him off." The defendant claimed to have snatched some cash from the dealer's hand and run. The defendant had $26 or $27, which he gave to Mrs. Winters. At approximately 9:00 or 9:15 p.m., they drove to a drug house, where the defendant purchased two or three "quarters" of cocaine, which cost $20 each. The defendant did not want to return to Northside Inn for fear that the drug dealer from whom he had stolen the money would be there, so Campbell took the Winters to Cherokee Motel at about 10:30 or 11:00 p.m. The three went inside and used the cocaine, and then Campbell departed at approximately 11:00 a.m. He stayed up all night using cocaine with Pamela Gray, who is his cousin, and another woman.

Campbell returned the following morning with Ms. Gray. They took the defendant to the home of Dewayne and Robbyn Lee and Mrs. Winters to Northside Inn, where Campbell helped unload the Winters' personal belongings. That morning, Campbell sold the handgun that the defendant had used the previous evening to Dennis Crane. He did so after Ms. Gray ran out of money. He did not remember whether he did so before or after picking up the Winters.

Campbell admitted that he had entered into an agreement with the state whereby he would not have to serve any incarcerative time for the victim's homicide and theft provided he testified truthfully at the defendant's trial.[1] He likewise admitted that he had prior felony convictions for armed robbery and burglary, as well as misdemeanor theft convictions. He acknowledged that he had not been truthful when initially questioned by law enforcement.

Campbell denied having discussed the victim's killing with Pamela Gray on the day after the homicide. He claimed that he first learned of the victim's death on the day following the

---

[1]It appears from information elsewhere in the record that the agreement was that the sentence initially imposed would not involve incarceration, although incarceration would be a possibility should Campbell violate the terms of the initial non-incarcerative sentence.

crime when he was visiting Crystal and David Graham, who told him that the man who owned Northside Inn had been shot.

Pamela Gray confirmed Campbell's testimony that the two had been up all night using cocaine during the late evening of April 28 and early morning of April 29. She recounted that she and Campbell picked up the Winters on April 29 and took them to a residence. The Winters had a disagreement, and they took Mrs. Winters to Northside Inn. She confirmed that she was with the defendant when they sold a gun to Dennis Crane on the morning of April 29. The state's questioning of Ms. Gray about what Campbell told her about the crime was not clear. It went as follows:

> State: [A]t any point that morning, did he tell you about any sort of plan that he, Trudy Winters and Rob Winters had had?
> A    That morning?
> Q    Did he tell you what they had done?
> A    Yes.
> Q    What did he tell you . . . had happened?
> A    He says that guy, Robert Michael Winters, had gone in and was supposedly going to rob him to get enough money to get a large amount of cocaine in Florida, that's why they had the stuff in the van.
> . . . [objection to question and ruling thereon]
> Q    Had your cousin told you the individual that they were going to robbed, [sic] had he identified him?
> A    Yes, ma'am. Well, he said it was an older white man and that was the same place that we took that lady back to in her apartment and that's where it was supposed to go down at, you know.
> Q    So that morning he had told you. Do you recall what time it was, that it was that he told you that the plan was to rob a black man?
> A    Yes, ma'am, it was early that morning I would say between 8 and 9 o'clock.

Ms. Gray also recounted that Campbell said, "I hope that old man didn't get killed," referring to "an older white man."

Emma Hargis testified that she lived at Northside Inn in April 1997. Her residence was one-half of a house trailer, and the victim lived in the other half. At about 5:30 p.m. on April 28, Ms. Hargis saw the victim talking to someone unknown to her. The person was on the victim's closed-in porch, and they were arguing about money. It appeared that the person was forcing himself or herself into the area where the victim was. The person was approximately 6'1" with sandy blond hair. She assumed but was not sure that the person was a man. He or she was in a white car and had a dark-haired passenger. About two or two and a half months later, Ms. Hargis played pool with the passenger in a bar. By reference to a mug shot of Bo Campbell, she positively identified him as the person she saw arguing with the victim on April 28.

Around 8:00 or 8:15 p.m. on April 28, Ms. Hargis heard the victim moving around his side of the trailer. She heard a gunshot about 9:45. She then heard noises that sounded like someone rearranging furniture. After the gunshot, Ms. Hargis' husband, Timothy, went outside to look around. When he returned he was shaken and stuttering. As a result of a conversation she had with her husband after he returned, Ms. Hargis did not go to the police, although she did talk to them the next day when they were on the scene investigating the homicide. Shortly after 11:00 that night, the television in the victim's residence got very loud, and Mr. Hargis went outside a second time.

Robbyn Lee testified that she had seen the defendant in her home briefly about 6:00 a.m. on April 29. He returned with Mrs. Winters later that afternoon. A day or two later, the Winters came to Ms. Lee's home and instigated a confrontation over $20 the Winters claimed Ms. Lee owed them. Ultimately, Ms. Lee summoned the authorities, and when they arrived, the defendant fled on foot. While seated in a police vehicle, Mrs. Winters threatened the lives of Ms. Lee and her child.

The individual identified by Mrs. Winters as the drug dealer she, the defendant, and Campbell planned to rob testified for the state. He denied any involvement in the drug trade. He met the defendant through the defendant's brother, and the defendant did some construction work for him.

Detective Charles Dudley of the Chattanooga Police Department testified that he interviewed the defendant a few days after the crime when the defendant was apprehended following his flight from officers who responded to the altercation at Robbyn Lee's house. The defendant told Det. Dudley that on the night of the crime, he and his wife had been out drinking and spent the night in a motel. When Mrs. Winters was interviewed, she said that she had been out drinking with her husband, Campbell, and some other individuals. She claimed that they spent the night at Northside Inn. When the defendant was informed that his wife had given a version of events inconsistent with his own, he invoked his Fifth Amendment rights.

Detective Dudley recounted that he had received a lead from a resident of Northside Inn that a resident other than the defendant had been seen knocking on the victim's door about 9:15 or 9:30 on April 28. Shortly thereafter, the citizen informant heard an argument followed by a gunshot. The informant described the individual he had seen as being about 6' tall, skinny, dirty looking, and having brownish-black hair. Det. Dudley interviewed the individual identified, and that person had an alibi that Det. Dudley was able to confirm. Likewise, this person's apartment was searched, and no evidence of the crime was discovered. Thus, that person was eliminated as a suspect.

According to Det. Dudley, the defendant consented to a search of his apartment. The officers recovered some pawn tickets and two checks written to the defendant and his wife on Glenn Lee's account. The officers also observed that the Winters' belongings were packed in boxes.

Glenn Lee testified that three unsigned checks had been taken from his checkbook without his knowledge at the time. He testified that he kept the checks in the vehicle in which he sometimes transported the Winters, and the only other individual who was in this vehicle during the relevant time period was his son.

According to the medical examiner, the victim died from a gunshot wound to the head one to two hours after eating his last meal on the evening of April 28. An individual would remain conscious for no more than a few seconds after receiving an injury of the type the victim sustained. A family member of the victim testified that the victim ate dinner with him and finished eating at approximately 8:00.

Testimony from multiple witnesses established that the victim had a .22 caliber handgun. This weapon was not found by the investigating officers who responded to the scene, although .22 caliber ammunition was found. Furthermore, the victim's wallet was not discovered. There was no sign of forced entry to the victim's home. According to multiple witnesses, the victim kept his doors locked. There was likewise no sign of a struggle.

By stipulation, the jury was informed that there was scientific evidence that a .25 caliber cartridge casing found at the scene was fired from a weapon identified by Bo Campbell as being the handgun he had provided to the defendant. Likewise, a .25 caliber bullet recovered from the victim's body "was probably fired" from that recovered weapon.

To counter the state's proof, the defendant offered evidence which he contended supported his defense theory that Bo Campbell was the actual killer and that the defendant's wife was helping frame the defendant for the crime.

Wilma Crane testified that she knew Bo Campbell because he came to her home and sold things to her husband from time to time. On one such occasion, he came to the Crane home with Pamela Gray and sold a gun to Mr. Crane. The witness had seen Campbell driving a white car on occasion, which he said was his daughter's car.

The defendant's proof also included the testimony of Michael Smith, a resident of Northside Inn in April 1997. Smith had been a suspect in the case, but the authorities eventually eliminated him. After the victim's killing, he rented the trailer in which the victim and the Hargises had lived. While removing the partition between the two sides of the trailer, he observed that it was very thin and that sound traveled freely through it.

Brenda Colvin, who lived at Northside Inn in April 1997, testified that she heard a loud, popping noise coming from the direction of the victim's residence after about 11:00 or 11:30 on the evening of April 28. The following morning, she left for work at 7:10 to 7:15, and she saw a small to medium white Pontiac or Chevrolet in front of the victim's apartment. When she opened her door, the car sped off. The driver was small, and he wore his long, dark hair in a ponytail.

Michelle Dykes testified that Mrs. Winters worked for her cleaning houses. Mrs. Winters was always desperate for money and frequently sought advances on her wages. Ms. Dykes testified that Mrs. Winters had been angry at the victim because the Winters' rent had been overpaid, and the victim would not refund the amount of the overpayment. Ms. Dykes thought that she witnessed a confrontation between the victim and Mrs. Winters over this matter on two separate occasions. While angry over the financial disagreement with the victim, Mrs. Winters said, "I'm going to kill that SOB." On one particular occasion when Ms. Dykes was driving Mrs. Winters home, they saw someone Mrs. Winters called Bo, who Mrs. Winters motioned to pull over. Mrs. Winters got in the car with Bo after telling Ms. Dykes that Bo was "who she got her stuff from" and she did not want her husband to see her with Bo.

Finally, the defendant took the stand. He testified that in April 1997, he was 5'7.5" or 5'8" tall and weighed 135 pounds. At that time, he had gray hair which rested on his shoulders. He characterized his relationship with the victim as a positive one and denied that he had ever had an argument with him. He acknowledged that he and his wife had fallen behind in paying rent at times, but he said the victim had always let them make it up. He further acknowledged that the victim had left a note on his door during the last week of April that the Winters must pay rent or move out, and he had discussed this matter with the victim. The defendant had given the victim one of Glenn Lee's forged checks and asked the victim to hold it until Friday, the day rent was due and the day the defendant would be paid. The defendant intended that the victim not deposit the check. The victim had offered to excuse rent payment if the defendant would work on a four wheeler for him.

The defendant admitted that he and his wife were using drugs during the time preceding the victim's homicide, but he minimized his own drug use and said that he suspected his wife's use was more extensive than his own. He said that Bo Campbell would buy drugs for them. He suspected that his wife had a relationship with Campbell because he found them alone together in the apartment smoking crack cocaine.

According to the defendant, he and his wife went to a tavern at 3:00 or 4:00 p.m. and drank alcoholic beverages. Mrs. Winters wanted some cocaine, so Mr. Winters paged Campbell, who arrived, collected money from the defendant, and returned later with the drugs. The three went to Northside Inn to get high; Campbell left, and the Winters returned to the tavern. Desiring more drugs, the defendant paged Campbell again and gave him $40 when he arrived. Campbell departed to procure drugs, and the defendant went to Northside Inn to check on his dog and change his shirt. While at Northside Inn, the defendant decided to knock on the victim's door to see whether he could use the victim's telephone, but no one answered. The defendant returned to the tavern. Campbell returned, as well, and did not have any drugs. The three left the bar, went to get gas and cigarettes, and then went to a location near the Cherokee Motel to get drugs. They then checked into the Cherokee Motel and got high. Campbell left unexpectedly. The next morning, the defendant paged Campbell repeatedly until Campbell arrived to pick the Winters up. Campbell took them to the Lee residence so that the defendant could ask Glenn Lee to loan him $20. Campbell then took the

Winters to Northside Inn. The defendant gathered some of their belongings and walked to a pawn shop, where he obtained $40 for the items.

The defendant flatly denied that he had been part of a plan with his wife and Campbell to rob a drug dealer. He likewise denied that he had killed the victim, and he denied knowing who had done so.

The defendant claimed that when his apartment was searched by the authorities, the boxes of clothing they discovered were the mechanism the Winters used for storing these items due to inadequate storage space in the apartment. He denied that the belongings had been loaded and unloaded in and out of Campbell's van as part of a plan to go to Florida.

To explain his flight from the authorities at Robbyn Lee's home in the days following the homicide, he claimed that after he gave the police his identification he heard a "10-7" on the radio and knew that he would be taken into custody for an outstanding Virginia warrant.

The defendant acknowledged having forged two of the three checks drawn on the bank account of Glenn Lee. He admitted knowing that he was breaking the law when he forged the checks.

The defendant was questioned about a letter he wrote to his wife while he was in jail awaiting trial. The letter itself had been received into evidence during the state's case-in-chief. The letter is lengthy. Its primary topic is the murder prosecution of the defendant. In it, the defendant recites extensive factual information regarding the crime, which the state contended was an effort by the defendant to tell his wife what to say to the authorities if questioned and how to testify at trial. The defendant claimed, however, that this recitation was to acquaint his wife with the information contained in discovery materials that the defense had received from the state and that he was not trying to tell her what to say. The letter also contains references to the defendant's love for his wife and to their wedding vows.

After receiving the evidence, the jury found the defendant guilty of premeditated murder, felony murder, and especially aggravated robbery. The court accepted the verdict and merged the two murder counts. The defendant was sentenced to life for the murder conviction and 12 years for the robbery,[2] with the sentences to be served concurrently.

# I

In three interrelated issues, the defendant challenges (1) the trial court's denial of his motion for judgment of acquittal and motion for new trial, (2) the jury verdict as being contrary to the weight of the evidence, and (3) the sufficiency of the convicting evidence. The thrust of the

---

[2]The trial transcript reflects that the defendant was found guilty of especially aggravated robbery. However, the judgment reflects that the conviction offense was amended to aggravated robbery by agreement of the parties.

defendant's argument relative to all of these issues is that he should not have been found guilty on the evidence presented and the trial judge erred in accepting the verdict.

We begin with the defendant's claim that the verdict is contrary to the weight of the evidence, or in other words, the trial judge should not have accepted the verdict. Rule 33(f) of the Rules of Criminal Procedure imposes a mandatory duty on the trial judge to serve as the thirteenth juror in every criminal case. *State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995). Under the Rule, the judge is empowered to grant a new trial if he disagrees with the jury about the weight of the evidence. Tenn. R. Crim. P. 33(f). "Rule 33(f) does not require the trial judge to make an explicit statement on the record. Instead, when the trial judge simply overrules a motion for new trial, an appellate court may presume that the trial judge has served as the thirteenth juror and approved the jury's verdict." *Carter*, 896 S.W.2d at 122. Only if the record contains statements by the trial judge indicating disagreement with the jury's verdict or evidencing the trial judge's refusal to act as the thirteenth juror may an appellate court reverse the trial court's judgment. *Id.* Otherwise, appellate review is limited to sufficiency of the evidence pursuant to Rule 13(e) of the Rules of Appellate Procedure. *State v. Burlison*, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993). If the reviewing court finds that the trial judge has failed to fulfill her role as thirteenth juror, the reviewing court must grant a new trial. *State v. Moats*, 906 S.W.2d 431 (Tenn. 1995).

The record before us indicates that the trial judge explicitly discharged her duty as thirteenth juror and announced her agreement with the verdict returned. In this situation, we may not second-guess her ruling. *See Burlison*, 868 S.W.2d 718-19. As stated above, we are limited to a review of the sufficiency of the convicting evidence. *See id.*

The question of sufficiency of the convicting evidence encompasses not only the defendant's appellate challenge to that issue, but his challenge to the trial court's ruling on the motion for judgment of acquittal, as well. This is because the standard by which we review a lower court's ruling on a motion for judgment of acquittal is analogous to the standard employed when reviewing the sufficiency of the convicting evidence after a conviction has been imposed. *See State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998); *State v. Adams*, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995).

To that end, when an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Duncan*, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1, 8 (Tenn. 2000).

Moreover, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237 (Tenn. 1973); *State v. Jones*, 901 S.W.2d 393, 396

-10-

(Tenn. Crim. App. 1995); *State v. Lequire*, 634 S.W.2d 608 (Tenn. Crim. App. 1987). However, before an accused may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." *State v. Crawford*, 225 Tenn. 478, 482, 470 S.W.2d 610, 612 (1971); *Jones*, 901 S.W.2d at 396. In other words, "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *Crawford*, 470 S.W.2d at 613; *State v. McAfee*, 737 S.W.2d 304, 305 (Tenn. Crim. App. 1987).

In determining the sufficiency of the evidence, this court should not reweigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); *Farmer v. State*, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). On the contrary, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Cabbage*, 571 S.W.2d at 835.

The evidence against the defendant was entirely circumstantial, and the state's case against him rested in large part on the testimony of Trudy Winters and Bo Campbell. On appeal, the defendant asks us to discredit the jury's factual findings regarding the credibility of these two witnesses as well as Pamela Gray. However, the law does not allow us to bypass the jury's findings on issues of witness credibility simply because the evidence is capable of supporting a different conclusion. *See id.*

The defendant's convictions are of first-degree premeditated murder, felony murder in the perpetration of robbery, and aggravated robbery.[3] In the light most favorable to the state, the evidence shows that the defendant, Trudy Winters, and Bo Campbell formulated a plan whereby the defendant would steal $3,000 from a drug dealer. Campbell provided the defendant with a weapon. Rather than robbing the drug dealer, the defendant shot and killed his landlord and stole money from him. Mrs. Winters and Campbell were waiting nearby, and Campbell provided transportation away from the scene of the crime. Campbell also disposed of the murder weapon by selling it to another individual. One of the victim's tenants saw the defendant knocking on the victim's door around the time of the crime. The defendant had no money before going to Northside Inn around the time that the victim was killed; he had cash in his hand when he returned. Campbell told his cousin the morning after the crime that the defendant claimed that the gun had accidentally discharged when he fell out a window; Campbell said that he hoped the defendant had not shot and killed "the old man."

---

[3]*See supra* n.2.

When viewed in this light, the evidence is sufficient to support the defendant's conviction of aggravated robbery. In the light most favorable to the state, the evidence shows that the defendant committed an intentional or knowing theft from Vernise Sheffield by violence or putting the victim in fear, and the victim suffered serious bodily injury.[4] This evidence is more than sufficient to support an aggravated robbery conviction. *See* Tenn. Code Ann. § 39-13-402 (1997) (aggravated robbery).

The evidence likewise supports the felony murder conviction. Considering the evidence in the light most favorable to the state, the defendant killed the victim in the course of perpetrating a robbery. *See id.* § 39-13-202(a)(2) (1997) (amended 1998, 2002) (felony murder).

We are unpersuaded, however, that the evidence sufficiently supports the defendant's guilt of first-degree premeditated murder. That crime is "[a] premeditated and intentional killing of another[.]" *Id.* § 39-13-202(a)(1) (Supp. 2002). Even when considered in the light most favorable to the state, the evidence does not demonstrate that the homicide was a premeditated one. Once the evidence establishes that a homicide has occurred, it is presumed to be second-degree murder. *State v. Gentry*, 881 S.W.2d 1, 4 (Tenn. Crim. App. 1993). To elevate the crime to the greater offense of first-degree murder, the state must prove premeditation or that the crime was committed in the perpetration of one of a specific group of felonies. *See id.* In this case, the state has not carried that burden as to premeditation.

Premeditation may be inferred from circumstances surrounding the killing. *State v. Coulter*, 67 S.W.3d 3, 72 (Tenn. Crim. App. 2001). Such circumstances may include "a defendant's use of a deadly weapon upon an unarmed victim; the cruelty of the killing; declarations by a defendant of an intent to kill; the defendant's procurement of a weapon; a defendant's preparations prior to a killing for concealment of the crime; and calmness immediately after the killing." *Id.* There is evidence in this case of weapon procurement. With respect to whether the victim was unarmed, there is no evidence of a weapon being recovered from the person of the victim; however, a handgun which he was known to carry in his pocket was never recovered. There is no evidence that the defendant was calm after returning from Northside Inn; in fact, he was shaken and pale. Given the lack of strong circumstantial proof of premeditation, the defendant's conviction of first-degree premeditated murder cannot stand, inasmuch as the state failed to offer sufficient proof to elevate the offense from second-degree murder to first-degree murder.

We are then left with the question of the proper disposition. Often this court will modify a conviction of a greater offense of which the evidence is insufficient to a conviction of a lesser-offense of which the evidence is sufficient. *See, e.g., State v. George Blake Kelly*, No. 01C01-9610-CC-00448 (Tenn. Crim. App., Nashville, Oct. 13, 1998) (second-degree murder conviction dismissed for insufficient evidence and conviction of vehicular homicide imposed). As

---

[4]Aggravated robbery may be committed with a deadly weapon, or it may involve serious bodily injury to the victim. The indictment alleged that the crime involved serious bodily injury, so our sufficiency-of-the-evidence analysis extends only to that alternative.

stated above, the state sufficiently established that the defendant committed a homicide, presumptively second-degree murder. The state did not offer sufficient proof to elevate the offense to first-degree premeditated murder, nor was the presumption disturbed by any proof that the offense was a lesser one than second-degree murder. However, this is not a case in which judicial imposition of a second-degree murder conviction is appropriate. As discussed in section II. below, harmful error attended the jury instructions relative to this count, and reversal with remand is the proper disposition.

Finally, the defendant claims in the section of his brief pertaining to these issues that the trial court erred in denying his motion for new trial. The defendant does not elaborate on this claim specifically. However, the motion and amended motion for new trial indicate that the defendant raised issues that the evidence was insufficient to support the convictions[5] and that the verdict was contrary to the weight of the evidence. To that extent, any issue relative to the motion for new trial was addressed above. However, to the extent that the defendant may be attempting to assign error to any additional rulings of the trial court relative to the motion for new trial, we are unable to consider whether the trial court erred because the transcript of the hearing on the motion for new trial is not included in the appellate record. *See* Tenn. R. App. P. 24(b) (duty of appellant to include transcript of proceedings as necessary to convey a fair, accurate and complete account of what transpired in the trial court relative to issues raised on appeal).

## II

Next, notwithstanding the defendant's position at trial that the evidence pointed to Bo Campbell rather than himself as the killer and his admission that he was in the company of Campbell and Ms. Winters on the evening of the crime, the defendant argues on appeal that there is no evidence to support a criminal responsibility charge. Moreover, he claims that the instruction, as given, was incomplete inasmuch as it omitted the natural and probable consequences rule. The state concedes that the natural and probable consequences portion of the charge should have been given, but it argues that no harmful error occurred.

Under the relevant statute

A person is criminally responsible for an offense committed by the conduct of another if:
. . .
(2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]

Tenn. Code Ann. § 39-11-402(2) (1997).

---

[5]While sufficiency of the convicting evidence is an oft-raised issue in motions for new trial, the remedy for a conviction premised upon insufficient evidence is dismissal of the prosecution, rather than a new trial.

A defendant is criminally responsible not only for the intended, or target crime, but also for those collateral crimes committed by a co-participant in the criminal episode that are the natural and probable consequence of the target crime. *See State v. Richmond*, 90 S.W.3d 648, 654 (Tenn. 2002). Although it had its roots in the common law, the so-called "natural and probable consequences rule" survived the 1989 codification of Tennessee law relative to the culpability of co-participants; thus, a defendant whose confederate commits a reasonably foreseeable crime in the course of perpetrating the target crime is liable for both the target crime and the incidental crime. *See id.* at 655-56; *State v. Carson*, 950 S.W.2d 951, 955 (Tenn. 1997).

## A. Criminal Responsibility Instruction

We consider first whether the evidence supported a criminal responsibility charge. The defendant argues that the evidence supports only one of two logical conclusions – that he is guilty because he was the killer and robber, as advanced by the state, or alternatively, that he is not guilty but is being framed by Bo Campbell, who was the real killer and robber, and by Mrs. Winters. He claims that there is no evidence of some intermediate theory whereby he was part of a conspiracy with Campbell and Mrs. Winters in which Campbell was the shooter and robber; therefore, he cannot be guilty of the crimes under a criminal responsibility theory.

We are not persuaded that the jury was required to accept this all-or-nothing approach to evaluation of the evidence. Rather, the jury's role as the trier of fact is to determine which portions of the evidence are illustrative of the truth relative to disputed events. The defendant cites no authority for the proposition that the jury must either accept or reject a witness's testimony *in toto*, and we disagree with that proposition as a correct statement of the law. *See, e.g., State v. Adams*, 45 S.W.3d 46, 56 (Tenn. Crim. App. 2000) (jury entitled to accept portions of witness's testimony and reject other portions), *perm. app. denied* (Tenn. 2001); *State v. Gilbert*, 612 S.W.2d 188, 190 (Tenn. Crim. App. 1980) ("The jury was entitled to accept that part of the defendant's proof they felt was consistent with truth and reject that portion they believed originated in falsity."). There is evidence that the defendant, Mrs. Winters, and Bo Campbell planned a robbery. On separate occasions on the day of the crime, both the defendant and Campbell were seen at the victim's home. Campbell, Mrs. Winters, and the defendant spent time together on the evening that the crime occurred, and they were together the following morning. There is evidence that would support a theory of guilt premised upon the defendant having conceived a plan with his wife and Campbell that the defendant would commit a robbery so that the three could use the proceeds to purchase drugs in Florida for resale in Tennessee. Thereafter, Campbell, perhaps with the assistance of the defendant, shot the victim and took his money. The three fled the scene. For some reason, the Winters and Campbell thereafter abandoned their plan to go to Florida to purchase drugs for resale. This evidence is sufficient to give rise to the obligation of the court to give a criminal responsibility charge.

## B. Natural and Probable Consequences Instruction

Having determined that the evidence supported a criminal responsibility instruction, we turn now to the question whether the lower court erred in failing to instruct the jury on the natural and probable consequences rule. Recently, our supreme court has established a three-part test for the imposition of criminal liability based on the natural and probable consequences rule, whereby the state's proof must establish beyond a reasonable doubt and the jury must find:

    (1)     the elements of the crime or crimes that accompanied the target crime;

    (2)     that the defendant was criminally responsible pursuant to Tennessee Code Annotated section 39-11-402; and

    (3)     that the other crimes that were committed were natural and probable consequences of the target crime.

*State v. Howard*, 30 S.W.3d 271, 276 (Tenn. 2000). A positive finding relative to the natural and probable consequences rule is an essential element which must be proven beyond a reasonable doubt before a conviction will lie on the basis of criminal responsibility. *Id*. at 277; *Richmond*, 90 S.W.3d at 657.

In the case at bar, the natural and probable consequences aspect of the instruction on criminal responsibility was not given. The state concedes this was error with respect to the felony murder count but posits that it was harmless. Moreover, it contends that no instruction was required for the robbery conviction, inasmuch as it was the target crime and not an incidental crime subject to the natural and probable consequences rule. The state takes no position with respect to the premeditated murder conviction.

## 1.     Especially Aggravated Robbery

Whether the natural and probable consequences instruction must be given for the target crime, as opposed to merely the incidental crime(s), is a question this court has faced recently. In *Howard*, the supreme court said that the incidental crimes must be the natural and probable consequences of the target crime. *Howard*, 30 S.W.3d at 276. However, in *Richmond*, the supreme court said that "the natural and probable consequences rule is 'an essential element that the State prove beyond a reasonable doubt' when seeking a conviction based on [a] theory of criminal responsibility." *Richmond*, 90 S.W.3d at 657 (quoting *Howard*, 30 S.W.3d at 277)). In the face of *Richmond*'s ambiguity whether the natural and probable consequences charge is required for the target crime as well as any incidental crimes, this court has interpreted *Richmond* to be consistent with *Howard*. That is, the natural and probable consequences rule instruction is required only for incidental crimes and not for the target crime. *See State v. Corey Mickens*, No. W1999-01169-CCA-R3-CD, slip op. at 12 (Tenn. Crim. App., Jackson, Feb. 14, 2003), *perm. app. denied* (Tenn. 2003); *State v. Daniel Wade Wilson*, No. E2000-01885-CCA-R3-CD, slip op. at 16 (Tenn. Crim. App., Knoxville, Aug. 2, 2001), *perm. app. denied* (Tenn. 2002).

Applying the principles of the foregoing cases to the one at bar, we conclude that the lower court did not err in omitting the natural and probable consequences instruction with respect to the especially aggravated robbery count, inasmuch as that count represented the target crime.

## 2.    Felony Murder

The question whether the natural and probable consequences instruction was required for the felony murder count is an intriguing one. "The [natural and probable consequences] rule underlies the doctrine of criminal responsibility and is based on the recognition that aiders and abettors should be responsible for the criminal harms they have naturally, probably and foreseeably put into motion." *Howard*, 30 S.W.3d at 276. In contrast, the felony murder statute, both as it existed at the time of the crime and today, does not require that a homicide committed during the course of one of the enumerated felonies be foreseeable. *See* Tenn. Code Ann. § 39-13-202(a)(2) (1997 & 2003); *State v. Hinton*, 42 S.W.3d 113, 119 (Tenn. Crim. App. 2000), *perm. app. denied* (Tenn. 2001). "When one enters into a scheme with another to commit one of the felonies enumerated in the felony murder statutes, and death ensues, both defendants are responsible for the death regardless of who actually committed the murder and whether the killing was specifically contemplated by the other." *Id.* (citing *State v. Brown*, 756 S.W.2d 700, 704 (Tenn. Crim. App. 1988)). Thus, the defendant in the case before us was statutorily responsible for *all homicides* committed during the course of the robbery, whether or not the homicide was foreseeable. As such, despite the state's concession that the instruction should have been given, the trial court was not required to give the natural and probable consequences instruction for the felony murder count.

## 3.    Premeditated Murder

Premeditated murder was neither the target crime nor one which begs for an exception to the general rule regarding instructions on the natural and probable consequences rule. Failure to give the instruction on this count was error. *See Richmond*, 90 S.W.3d at 657 (failure to give instruction for attempted first-degree counts was error).

Thus, the question then becomes whether it can be said beyond a reasonable doubt that the error was harmless. *See Howard*, 30 S.W.3d at 277 n.6. We are guided to an answer to that question by the supreme court's recent rulings in *Howard* and *Richmond*. Both cases involved a group of individuals who pursued a target crime of robbery, and in both, a shooting resulting in a homicide occurred. In both cases, the defendant was actually on the scene of the crime. In finding the instructional error harmless in *Richmond*, in contrast to the harmful error in *Howard*, the supreme court focused on the defendant's intent. *See Richmond*, 90 S.W.3d at 658. The court said that in *Howard*, evidence of the defendant's intent had been sharply contested, whereas in *Richmond*, the defendant "shared the intent of his fellow assailants and actively participated in every facet of the armed robbery and subsequent shootings." *Id.* In *Howard*, the defendant admitted he went with his confederates to a restaurant knowing that they planned a robbery, but he never admitted having a gun and claimed to have stayed in the back of the restaurant. *Howard*, 30 S.W.3d at 274. In *Richmond*, the defendant was armed and positioned proximately to the victims in order to assist his confederates

-16-

should it become necessary. *Richmond*, 90 S.W.3d at 658. He drove the getaway vehicle in a manner to allow one of his confederates to fire his weapon out of it. *Id.* He led the authorities on a high-speed chase. *Id.*

We believe the case at bar is more akin to *Howard* than *Richmond*. The evidence of the defendant's intent is contested in this case. The state's primary theory of liability is that the defendant was the leader in planning and executing the offense and that he alone went to the victim's home to perpetrate the crime. The defendant introduced evidence that there was no group plan to perpetrate a robbery; Bo Campbell perpetrated the crime, and the defendant had been framed as the perpetrator of the crime by Campbell and Trudy Winters. Although not primarily pursued by either party, the evidence might also support a conclusion that there was a conspiracy to commit a robbery to obtain seed money for a drug operation; Bo Campbell, either alone or with the active assistance of the defendant, committed the robbery and murder in furtherance of the plan. Given the contested evidence of the defendant's intent, we must conclude that the instructional error was not harmless beyond a reasonable doubt.

At this juncture, it is helpful to recall that the failure to give the natural and probable consequences instruction affected only the premeditated murder count, and in the previous section, we held that the evidence of premeditation was insufficient to sustain a conviction of that crime. However, the premeditated murder verdict was merged with the felony murder verdict into a single judgment of conviction. *See Howard*, 30 S.W.3d at 275 n.4 (dual verdicts of guilt of premeditated murder and felony murder should be merged into a single judgment of conviction); *State v. Addison*, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997) (single judgment for merged verdicts protects against double jeopardy). While we are constrained to find harmful error has tainted the verdict in the premeditated murder count, we are mindful that it may better serve the interests of the parties for this count of the indictment to be dismissed by the state rather than be the subject of another several-day trial, given that the first-degree murder judgment remains viable based upon the lack of error attending the felony murder verdict. It is, of course, the prerogative of the state, not this court, to make that election.

Thus, the defendant's conviction of premeditated murder is reversed.

### III

The defendant's third challenge is to the trial court's ruling allowing evidence of a letter the defendant wrote to his wife after his pre-trial incarceration. He claims that this letter was subject to exclusion pursuant to the marital communications privilege.

The letter in question was introduced by the state and characterized as incriminating and as suggesting that the defendant's wife relate a concocted version of events to investigators. After its introduction, the defendant characterized the letter as containing a recitation of the defendant's recollection of events on the night of the victim's killing and of the state's evidence as

-17-

revealed during pre-trial discovery. It is not disputed that the letter contains references to the couple's wedding vows and the defendant's love for his wife.

At the hearing regarding the admissibility of the letter, Trudy Winters testified that although she was still married to the defendant, she considered the marriage to have ended three years prior when the defendant had been taken to jail. Mrs. Winters claimed that although she and her husband lived together until his incarceration, their marriage had not been on steady footing; she had been the victim of domestic violence, and the defendant had previously abandoned her in California and then had been untruthful about his whereabouts. She conceded that she and the defendant exchanged letters after his incarceration, she having sent him at least 30 letters, and he having sent her about 100 letters. She claimed, however, that she had visited the defendant only once in his three years of incarceration, and she had not had any contact with him in a year and a half. Mrs. Winters explained that she was waiting for the defendant to be sent to prison because a divorce would be less expensive then, and even should he be found not guilty, she had no intention of resuming a marital relationship with him. Mrs. Winters conceded that she wrote a letter to the defendant after receiving the letter in question. Mrs. Winters' letter to the defendant was received as an exhibit. In it, she professes her love for the defendant and says that they are still husband and wife. She testified that when she wrote the letter she was no longer in love with the defendant and did not consider their marriage viable, although she would always love him.

The law in effect at the time of the trial court's ruling on the issue was that

(a)     In either a civil or criminal proceeding, no married person has privilege to refuse to take the witness stand solely because that person's spouse is a party to the proceeding.

(b)     In either a civil or criminal proceeding, confidential communications between married persons are privileged and inadmissible if either spouse objects. This communications privilege shall not apply to proceedings between spouses or to proceedings concerning abuse of one (1) of the spouses or abuse of a minor in the custody of or under the dominion and control of either spouse, including, but not limited to, proceedings arising under title 36, chapter 1, part 1; title 37, chapter 1, parts 1, 4 and 6; title 37, chapter 2, part 4; and title 71, chapter 6, part 1. This confidential communications privilege shall not apply to any insured's obligations under a contract of insurance in civil proceedings.

Tenn. Code Ann. § 24-1-201 (amended 2000). In order for the privilege to be recognized

(1)     The communication[] must originate in a confidence that [it] will not be disclosed.

(2)     This element of confidentiality must be essential to the full and satisfactory maintenance of the relation between the parties.

-18-

(3)    The relation must be one which, in the opinion of the community, ought to be sedulously fostered.

(4)    The injury that would inure to the relation by the disclosure of the communication[] must be greater than the benefit thereby gained for the correct disposal of litigation.

*State v. Price*, 46 S.W.3d 785, 799-800 (Tenn. Crim. App. 2000) (citing *Adams v. State*, 563 S.W.2d 804, 808 (Tenn. Crim. App. 1978)), *perm. app. denied* (Tenn. 2001).[6] Factor (A) focuses on the expectation of the communicating spouse at the time of the communication, whereas assessment for the presence of factors (B), (C) and (D) must be done from the facts as they exist at the time of the trial court's ruling. *State v. Leslie Thurman Mitchell*, No. E2002-01537-CCA-R3-CD, slip op. at 9-10 (Tenn. Crim. App., Knoxville, Aug. 1, 2003), *perm. app. denied* (Tenn. 2003). If the privilege is recognized relative to a given communication, it is inadmissible upon objection of either spouse.[7] Tenn. Code Ann. § 24-1-201(c)(2) (2000).

The lower court found that only the first of the four requisite factors existed and therefore permitted introduction of the defendant's letter to his wife. On appellate review, we must defer to the lower court's findings of fact relative to the existence or non-existence of the four factors unless the evidence preponderates to the contrary. *See Price*, 46 S.W.3d at 802.

With respect to the first factor, the evidence does not preponderate against the lower court's finding that the communication originated in a confidence that it would not be disclosed to third parties. On appeal, the state does not contend otherwise. The tenor of the letter supports an inference that the defendant believed the communication would remain confidential between himself and his wife.

The trial court found that none of the three remaining factors were established by the evidence. The evidence does not preponderate against these determinations. By the time of the hearing on admissibility of the letter, Trudy Winters no longer desired to have a marital relationship with the defendant and was anticipating his conviction so that she might obtain an inexpensive divorce. Even in better times, the marriage had involved domestic violence and betrayal. Thus, the element of confidentiality was not essential to optimal maintenance of the relationship, and this marriage was not a relationship which should be sedulously fostered. *Price*, 46 S.W.3d at 799-800. Moreover, given that the marriage was, for all intents and purposes, irretrievably damaged, there was not a risk of injury to it by disclosure of the communication to be balanced against the benefit from correct disposal of the prosecution. *See id.*

---

[6]The statute has since been amended to include the four-part test for determining whether the privilege will be enforced. *See* Tenn. Code Ann. § 24-1-201 (2000).

[7]There are certain exceptions, which are not pertinent here. *See* Tenn. Code Ann. § 24-1-201(c)(2).

In so holding, we have considered and rejected the defendant's several arguments relative to this issue. Much of the defendant's argument focuses on the credibility of Trudy Winters' testimony, particularly to the extent that it is at odds with the professions of love and commitment in the defendant's letter to her, as well as in a letter she wrote to him. However, the trial court considered all the evidence and resolved the credibility issues in favor of the state's position that the letter was admissible. We must defer to the trial court, which had the opportunity to see and hear the witnesses, in questions involving witness credibility. *See State v. Odom,* 928 S.W.2d 18, 23 (Tenn. 1996).

The defendant also complains that state actors, namely law enforcement agents, caused a rift between the defendant and Mrs. Winters when they threatened to charge Mrs. Winters with murder unless she testified against the defendant and told her falsely that the defendant was placing blame on her for the crimes. The defendant cites no authority for exclusion on this basis. To the extent that he may be attempting to use this argument as a means of neutralizing the evidence that the Winters' marriage was no longer viable, we are uncompelled. Even if we were to accept that exclusion of evidence would be the appropriate sanction for malfeasance by the state in this respect, there is not sufficient evidence of record for us to conclude that the law enforcement tactics employed by state actors in this case were outside the bounds of legitimate, reasonable activity in a homicide investigation.

In another argument which is devoid of citation to authority, the defendant claims that the letter had little or no probative value because its contents are "ambiguous and open to interpretation" inasmuch as it did not contain explicit admissions of guilt, only claims of innocence.[8] We presume this is an attack on the letter's relevance. *See* Tenn. R. Evid. 402 (only relevant evidence is admissible). However, the letter's contents concern the defendant's activities and whereabouts on the night of the homicide. The letter is relevant, and it is not subject to exclusion on this basis. To the extent that the letter may be viewed as ambiguous, resolution of its meaning was properly a matter for the jury's determination.

Finally, the defendant makes a somewhat ambiguous argument based upon the fact that there was no pending divorce proceeding at the time of trial. He contrasts this to the situation in *State v. Price*, in which there was pending divorce litigation and the marital communications privilege was not recognized. *See Price*, 46 S.W.3d at 802. We presume this is an effort to persuade this court that the state failed to prove (1) that the defendant's marriage would not be damaged by disclosure, and (2) that the state's interest in prosecuting the defendant for murder and robbery outweighed any harm that would befall the defendant's marriage. However, *Price* does not stand for the proposition that divorce proceedings must be initiated before the marital communications privilege will apply. In fact, *Price* merely noted that divorce proceedings were pending and concluded that "there was evidence that the defendant's marriage was already failing, whether his wife testified at this trial or not." *Id.* Such can be said in this case. Likewise, *Price* noted that, as

---

[8]This argument is at odds with the defendant's contention within the same portion of his brief that admission of the letter was "devastating."

here, there were no eyewitnesses to the murder, and "the testimony of the defendant's wife offered a significant benefit to the trier of fact, a greater benefit than any injury caused thereby." *Id.*

The trial court did not err in declining to recognize the marital communications privilege.

**IV**

Finally, the defendant claims that the trial court erred in admitting Trudy Winters' prior consistent statement. During cross-examination of Mrs. Winters, the defense highlighted several inconsistencies between her testimony and a prior statement she gave to Detective Dudley at a time when she professed to be telling the truth. It appears from the record that the trial court allowed the jury to hear a recording of the statement on the rationale that the state had the right to rehabilitate its witness with her statement once her credibility was assailed via inconsistent excerpts of the prior statement.

In his written motion for new trial,[9] the defendant claimed that the lower court erred in allowing the jury to hear the prior statement because it was not a consistent statement. On appeal, he contends that the prior statement should not have been admitted because it was made at a time when Mrs. Winters had a motive to lie, and it was unreliable due to myriad inconsistencies and Mrs. Winters' lack of credibility.

Generally, prior consistent statements are not admissible to rehabilitate a witness who has been impeached. *State v. Boyd*, 797 S.W.2d 589, 593 (Tenn. 1990). However, "[w]here specific questions and answers taken out of context do not convey the true picture of the prior statement alleged to be inconsistent, it is unfair to permit reference to isolated, unexplained responses by the witness and there is no error in allowing the statements to be placed in context." *Id.* at 594.

What occurred here is that the defense, on cross-examination of Mrs. Winters, mounted a vigorous effort to discredit her testimony by confronting her with variances between her trial testimony and prior statements she had given to law enforcement. This effort included highlighting several variances between her most recent prior statement to Detective Dudley, which she claimed had been wholly truthful, and her trial testimony. Two examples are recited by the defendant in his appellate brief. First, the witness told Dudley that after she was released from police questioning shortly after the crime, she and Bo Campbell used crack cocaine together, whereas at trial she said that she called Campbell to give her a ride home, but he did not do so.[10] Second, she

---

[9]The transcript of the motion for new trial hearing is not in the record; to the extent that the lower court may have permitted any verbal amendments to the motion, we are unaware of any additional grounds upon which the defendant relied for his argument that Mrs. Winters' prior statement should have been excluded.

[10]Although the defense does not divulge the information in its brief, it should be noted that Mrs. Winters said on cross-examination that it was possible she used crack cocaine with Campbell after her release but that she did not

(continued...)

told Detective Dudley that on the night of the crime, she and Campbell went inside the tavern and had a beer while waiting for the defendant to return from Northside Inn, but in her direct examination testimony, she said that she had stayed in the van the entire time. The thrust of cross-examination relative to the prior statement was to highlight the inconsistent portions in isolation in order to call Mrs. Winters' overall credibility into question. As such, the prior statement was properly admitted to show the overall context of the excerpted portions utilized by the defense on cross-examination of Mrs. Winters.

Seeking to avoid the rule allowing admission of prior consistent statements in this situation, the defendant claims that Mrs. Winters' prior statement is not a consistent one. Although the defense is correct to the extent that Mrs. Winters' prior statement to Detective Dudley is not wholly consistent with her trial testimony, viewed in their respective entireties as regards the homicide of the victim, the prior statement and the trial testimony *are* fairly viewed as consistent. Both establish the major events surrounding the crime – the plan to rob a drug dealer, the defendant's trips to Northside Inn on the night of the crime, the gunshot, the defendant's possession of a weapon, the defendant's return after the second trip to Northside Inn with cash that he had not had previously, and the defendant's reluctance to return to the location of the crime. Although there are numerous inconsistencies, they are in the details and not in the overall import of the prior statement or the trial testimony. The defendant's focus on the inconsistencies unfairly painted a picture of the statement as an inconsistent one, and admission of the entire statement allowed the jury to view the inconsistencies in their overall context.

We are likewise unpersuaded by the defendant's argument that the statement should not have been admitted because it was made at a time that the witness had a motive to lie. A prior consistent statement may be admitted to rebut a claim of recent fabrication if the prior statement was made before the motive to lie arose. *See, e.g., Sutton v. State*, 155 Tenn. 200, 204, 291 S.W. 1069, 1070 (1927). The defendant cites this rule as a basis for excluding Mrs. Winters' testimony on the basis that she had the same motive to lie – avoiding criminal prosecution – when she gave her "truthful" statement as she did at trial. However, the defendant does not explain why this rule requires exclusion of a prior statement made when a witness had a motive to lie if the statement is admissible on some independent basis, as is the prior statement in the case at bar. Thus, we have rejected this argument.

In conclusion, the defendant's convictions of first-degree felony murder and aggravated robbery are affirmed. His conviction of first-degree premeditated murder is reversed, and the matter is remanded for a new trial on that count.

_____
JAMES CURWOOD WITT, JR., JUDGE

---

[10](...continued)
remember it and doubted it because neither of them had any money.