# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs January 16, 2013

## STATE OF TENNESSEE v. JACKIE D. SEYMORE

**Appeal from the Circuit Court for Montgomery County**
**No. 40900446     John H. Gasaway, Judge**

_____

**No. M2012-01109-CCA-R3-CD  Filed - February 28, 2013**

_____

The defendant, Jackie D. Seymore, appeals his Montgomery County Circuit Court convictions of rape of a child, claiming that the evidence was insufficient to support the convictions.  Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and PAUL G. SUMMERS, SR. J., joined.

Gregory D. Smith, Clarksville, Tennessee, for the appellant, Jackie D. Seymore.

Robert E. Cooper, Jr., Attorney General and Reporter; Jennifer L. Smith, Assistant Attorney General; John W. Carney, District Attorney General; and Art Bieber, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Originally charged with three counts of rape of a child for sexual abuse inflicted on his daughter, J.S., the defendant was convicted following a bench trial of two counts of rape of a child and acquitted of a third count.[1]

At trial, Yancey Seymore, the defendant's ex-wife and the victim's mother, testified that she met the defendant in 1995 and that the two married in 1999.  The victim was born on April 9, 1998.  Ms. Seymore said that the defendant was in and out of jail throughout their relationship, often spending no more than a few days or weeks with the family between

_____

[1]As is the policy of the court, we refer to the minor victim by her initials.

stints in confinement. Ms. Seymore divorced the defendant in September 2005 but continued to allow him to stay in the family home when he was not incarcerated. She specifically recalled that the defendant lived in her home during the month of February 2006, just before the victim's birthday.

Ms. Seymore testified that one evening in February 2008, the defendant came to the residence she shared with her three children and told her "that he was leaving town because he didn't have anything [t]here anymore and he did something really bad a while ago and he needed to tell the truth." Ms. Seymore said that she believed the defendant's pending confession to be "another one of his ploys to try to make [her] feel bad for him so he could come and stay." Instead, the defendant confessed to Ms. Seymore that he had sexually abused J.S., making a "reference to the Bible, about the two daughters sleeping with the father to become pregnant." Ms. Seymore said that J.S. had told her on an earlier occasion that the defendant touched her inappropriately and that the defendant had denied the allegations when Ms. Seymore confronted him. She testified that the defendant told her that he had had sex with J.S. because "he just needed to know that somebody loved him."

Ms. Seymore said that following his confession, the defendant also claimed to have terminal cancer. She said that she did not believe the defendant and told him as much. At that point, she "told him to get up and get out of [her] house." After he left, she asked J.S. "for details" about the abuse she had suffered at the hands of the defendant. Ms. Seymore said that she telephoned the police after speaking with her own mother about the revelation.

Ms. Seymore said that she kept cocoa butter in the house "for the legs and elbows and stuff and . . . for sex" with the defendant.

Twelve-year-old J.S. testified that the defendant lived with the family but "wasn't around like a whole bunch" because "[h]e was in jail quite a bit." She said that the defendant stayed with the family even after he and her mother divorced. During one of the periods that the defendant was living with the family, the defendant did "inappropriate things" to her while her mother was at work. She elaborated that the defendant asked her to go into her bedroom and undress. Then the defendant would undress "except for his socks" and "touch [her] in inappropriate areas." On one occasion, the defendant placed his penis, which she described as "rough and black," inside her vagina. She said that she was certain that his penis penetrated her vagina because he "ma[d]e [her] look at it." J.S. testified that the defendant "put cocoa butter on his private parts" before the encounter. She said that "it hurt really bad" when the defendant penetrated her vagina with his penis. She testified that the defendant also penetrated her anus with his penis. She said that the defendant "put [her] face down" on the bed to penetrate her anally.

-2-

The victim said that the defendant had raped her at least four times, with at least one instance of both vaginal and anal penetration occurring before her birthday and after her parents' divorce. She could not recall with any specificity the time frame of the remaining offenses, but she speculated that one instance might have occurred in February before her parents divorced.

Nurse practitioner Beverly Cotton of the Our Kids Center in Nashville testified that she conducted a forensic pediatric examination of the victim on March 17, 2008. Ms. Cotton said that the victim's anal and genital examinations were "within normal limits." She explained that the results of the examination were not inconsistent with the victim's report of abuse given the delay between the time of the abuse and the examination.

Clarksville Police Department Detective Ginger Fleischer testified that she investigated J.S.'s report of abuse. Detective Fleischer testified that she presented the case to the grand jury and that she initially included a date range of January 1, 2005, to December 31, 2005, based upon the defendant's admission to police that he "put[] his penis in between" J.S.'s legs in 2005. Following the defendant's indictment, Detective Fleischer examined jail records that caused her to reexamine the information she had regarding the time frame of the abuse. Specifically, she said that she watched a video tape of the victim's forensic interview and returned to the grand jury armed with "the correct dates" and sought a second indictment.

During cross-examination, Detective Fleischer acknowledged that jail records established that the defendant was continuously incarcerated from September 2004 to March 2005.

Following Detective Fleischer's testimony, the State rested.

The defendant testified that he had been in and out of jail for the previous six years serving sentences for a variety of misdemeanor offenses and probation violations. He recalled specifically that he was incarcerated from September 2004 to March 2005 "serving an eleven twenty-nine . . . for some stuff [he] had done at Hilltop." He acknowledged that jail records established that he was also incarcerated on February 3 and 4, 2006. He was released briefly and returned back to jail on February 15. He remained in jail for the next few months.

The defendant conceded that he went to Ms. Seymore's house on February 8, 2008, and that he did so for the purpose of apologizing for the "bad things" he had done to his children. He explained, however, that the "bad things" included taking the children's property to sell for money to get drugs. He said that he wanted to "make amends" for his years of drug use. He claimed that Ms. Seymore "took things the wrong way" and kicked

him out of the house.  He adamantly denied having sexual contact with J.S.

The defendant said that he went to Kroger's and stole a bag of shrimp on the following day so that he could be incarcerated, explaining, "The only time that I am ever clean is in here, that's why I stay in here most of the time.  I live in the street, man."

The defendant acknowledged that cocoa butter was present in the home but claimed that it was only for his body and "not used for no type of sex."

During cross-examination, the defendant insisted that Ms. Seymore had not ever confronted him about abusing J.S.  He said that both Ms. Seymore and J.S. were lying.  He acknowledged that he always wore his socks when having sex and that he had told Detective Fleischer that he had rubbed his penis on the victim.

On the basis of this evidence, the trial court convicted the defendant of one count of rape of a child based upon the defendant's penetrating the victim's vagina with his penis "sometime in the month of February, 2006" and one count of rape of a child based upon the defendant's penetrating the victim's anus with his penis during that same time frame.  The trial court acquitted the defendant of a third count of rape of a child.

Following a sentencing hearing, the trial court imposed sentences of 25 years' incarceration for both child rape convictions and ordered the sentences to be served concurrently, for a total effective sentence of 25 years.

On May 10, 2012, the trial court granted the defendant limited post-conviction relief in the form of a delayed appeal on the basis that "[d]ue to attorney oversight, no appeal was filed and the jurisdictional time period to file said appeal has passed."  The court held the defendant's remaining claims for post-conviction relief in abeyance pending the outcome of this delayed appeal.

In this appeal, the defendant challenges the sufficiency of the convicting evidence, arguing that the evidence conclusively "placed the event in 2005, when [the defendant] was locked up in the jail."  The State contends that the evidence was sufficient to support the defendant's convictions.

We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003).  "[D]irect and circumstantial

evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

Rape of a child is defined as the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522(a) (1997). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." *Id.* § 39-13-501(7).

Here, the victim testified that the defendant penetrated both her vagina and her anus with his penis on at least four occasions. Although she could not remember with any specificity the specific dates of the offenses, she testified that at least one instance of both vaginal and anal penetration occurred before her birthday, which is in April, but after her parents' divorce, which occurred in September 2005. Ms. Seymore testified that although the defendant was in and out of jail during the majority of their relationship, she believed that he was in the home during February 2006. Jail records indicated that the defendant was out of jail from February 4, 2006, to February 15, 2006. This evidence supports the defendant's convictions of rape of a child.

Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE