IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs February 14, 2006

## STATE OF TENNESSEE v. WALFRIDO L. RODRIGUEZ

**Appeal from the Criminal Court for Davidson County**
**No. 2003-C-1613    Cheryl Blackburn, Judge**

---

### No. M2005-01351-CCA-R3-CD  - Filed June 7, 2006

---

The defendant, Walfrido L. Rodriguez, appeals from his Davidson County Criminal Court jury convictions of second degree murder and aggravated assault, claiming that the trial court erred by instructing the jury to consider the charges sequentially, that the convicting evidence is insufficient, and that the trial court erred in rejecting a request for a special jury instruction. We discern no reversible error and affirm the convictions.

**Tenn. R. App. P. 3; Judgments of the Criminal Court are Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which GARY R. WADE, P.J., and ROBERT W. WEDEMEYER, J., joined.

Ross E. Alderman, District Public Defender; and Jeffrey Devasher, Assistant District Public Defender, for the Appellant, Walfrido L. Rodriquez.

Paul G. Summers, Attorney General & Reporter; Preston Shipp, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Robert McGuire, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

The defendant's trial for the first degree murder of Luis Negron Sierra and for the aggravated assault of Abraham Torres featured little factual controversy. The defendant and victim Sierra (hereinafter referred to as the victim) had been friends and coworkers. Mr. Torres is the victim's stepson and was 16 years old on April 3, 2003, the date of the victim's homicide. The victim was 24 years old on that date, and the defendant was 40 years old.

The state theorized an intentional, premeditated killing of the victim based upon the decision of Lillian Torres, the defendant's girlfriend, to leave the defendant and reside with the victim, his wife, and family and upon the victim's intervention in an argument between Ms. Torres and the defendant in January 2003. On April 3, a car driven somewhat erratically by David Noel

Ramos Gonzalez, an acquaintance of both the victim and the defendant, proceeded onto a park playground near the victim's apartment. The car stopped at a swing set where the victim and Mr. Torres were playing with the victim's toddler daughter. The defendant emerged from the passenger side of the car, and according to Mr. Torres, the victim, who had no gun on his person, "put his hands up in the air" in a gesture of "What's up?" When the victim and the defendant were two or three feet apart, the defendant shot two or three times. Mr. Torres testified the defendant pointed the gun at him. Mr. Torres and the child fled, and the victim ran a few yards before collapsing with a lethal wound to his lung and a vital blood vein and artery. The defendant returned to the car, and Mr. Gonzalez drove away.

By all accounts, the defendant surrendered to law enforcement officers several minutes later. He walked to a sheriff's department training center and stated that he wished to surrender for shooting another man.

At trial, the defendant testified that he shot the victim in self-defense. He testified that only minor friction developed between him and the victim over the defendant's January argument with Lillian Torres and that the friction had been resolved. He believed, however, that the victim developed animosity toward the defendant because of the victim's ill feelings toward Mr. Gonzalez. The defendant testified that the victim had hired Mr. Gonzalez to fix the victim's car, but the victim became angry when Mr. Gonzalez botched the repair job and damaged the vehicle's crankshaft. Sometime later, Mr. Gonzalez and his wife and child began residing with the defendant in the defendant's house. The defendant testified that the victim remained hostile toward Mr. Gonzalez because he had not paid for a new crankshaft and that, at one point, the victim asked the defendant to let him come to the defendant's house one night and take the Gonzalez family "away." The defendant testified that he refused and ordered the victim out of his house. The defendant said that, although he and the victim remained friends after this incident, they were never again close.

One morning, near the first of April, the defendant discovered that someone had broken out his car windows the preceding night. The defendant suspected the victim because he found part of a golf club that he recognized as belonging to Abraham Torres or one of his friends. By this time, a man named Juan Arredonda Buenida was residing in the defendant's house, and the defendant asked Mr. Buenida to take the car to a car wash to clean it up. The defendant testified that Mr. Buenida, who was at the car wash, called the defendant and told him that the victim and his sons had accosted him with a gun, beat him, and damaged the defendant's car. The defendant testified that one of his car doors had been bent backwards and sprung. He testified that he became fearful after this incident and purchased a handgun from a friend.

The defendant testified that, in the next few days, he became more nervous and had difficulty sleeping. He thought about going to see the victim to resolve the friction. On April 3, he rode around with Mr. Gonzalez. Mr. Gonzalez encouraged the defendant to see the victim before Mr. Gonzalez left for work; otherwise, Mr. Gonzalez could not take the defendant to see the victim until late that night. Mr. Gonzalez insisted that the defendant take the handgun, and although the defendant refused, Mr. Gonazlez went into the house and obtained the gun.

The men stopped at a flea market on the way to the victim's apartment because the defendant wanted to buy a rug. Instead, he bought a straight razor because it was a bargain and because he used a straight razor for shaving. When they arrived at the victim's neighborhood, Mr. Gonzalez saw the victim at the swing set in the park and drove erratically in that direction. The defendant testified that when he got out of the car, the victim came toward him taking long steps, making "big gestures," and describing the defendant in profane terms. As the victim approached, the defendant saw that the victim had his hand inside his shirt, and Mr. Gonzalez yelled that the victim had a gun. The defendant testified that he retreated to get in the car and leave, but Mr. Gonzalez "stretched out" the gun to him and said, "It's ready." When the defendant saw the victim nearly upon him, he fired three or four times. The victim and Mr. Torres ran, and the defendant got back in the car, thinking that he had not hit the victim. As Mr. Gonzalez was driving away, the defendant saw the victim fall to the ground and testified that, then, "[t]he whole world caved in on me." Several minutes later, despite Mr. Gonzalez's objections, the defendant surrendered to the police.

Mr. Buenida testified in the defendant's behalf about being assaulted at the car wash. He testified that when he got out of the defendant's car at the car wash, two men accosted and pistol-whipped him. Mr. Buenida heard the victim say, "It's not him" and then saw the victim sitting beside them in his car. Mr. Buenida essentially opined that, despite his being a much smaller man than the defendant, the victim and his associates could have mistaken him for the defendant because Mr. Buenida wore the defendant's jacket.

The jury convicted the defendant of the second degree murder of the victim and of the aggravated assault of Mr. Torres.

### I. Jury Instruction for Sequential Consideration of Charged Offenses

In his first appellate issue, the defendant claims that he was denied his right to a jury trial when the trial court effectively precluded the jury's consideration of the lesser included offense of voluntary manslaughter.[1] Specifically, the defendant challenges the trial court's instruction that

---

[1]The trial court instructed the jury:

> When you begin your deliberations on each count of the indictment you must first deliberate on the indicted or charged offenses. If you find the defendant guilty of the indicted offense you may stop your deliberations as to that count of the indictment. You would then begin your deliberations as to the remaining counts of the indictment. If you find the defendant not guilty of the indicted offense in each count or you have a reasonable doubt, then you must find the defendant not guilty of the indicted offense and next consider the lesser included offense in each count as set out below and in your verdict form.
>
> . . . If[, after considering second degree murder,] you find the defendant guilty of second degree murder . . . you may stop your deliberations as to Count

(continued...)

the jury should consider the grades of homicide in descending order and stop its deliberation once it reached a unanimous verdict on a particular grade. In the present case, the jury apparently rejected first degree murder and then considered – and found the defendant guilty of – second degree murder without considering the defendant's liability for voluntary manslaughter.

The defendant concedes that, in Tennessee, the general rule is that "sequential" jury instructions are proper. We agree on this point. *See, e.g., State v. Mann,* 959 S.W.2d 503, 521 (Tenn. 1997); *State v. Raines,* 882 S.W.2d 376, 382 (Tenn. Crim. App. 1994). He maintains, however, that an exception to the general rule should be applied to recognize the unique relationship between second degree murder and voluntary manslaughter.

Second degree murder is the knowing killing of another. Tenn. Code Ann. § 39-13-210(a)(1) (2003). Voluntary manslaughter is committed by one who intentionally or knowingly kills another "in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." *Id.* § 39-13-211(a). "The danger arising from instructing the jury that it must consider and acquit for second-degree murder before considering voluntary manslaughter," argues the defendant in his brief, "is that the jury is barred from considering the significance of passion relative to the issue of second-degree murder versus voluntary manslaughter."

The defendant further concedes that, in a similar case, this court recently applied the general rule approving the use of a sequential instruction for the jury's consideration of second degree murder and voluntary homicide. *See State v. Earnest Gwen Humphrey*, No. M2003-01489-CCA-R3-CD, slip op. at 16 (Tenn. Crim. App., Nashville, Aug. 24, 2005), *perm. app. denied* (Tenn. 2006). The defendant relies, however, upon Judge Joseph M. Tipton's concurring opinion in *Earnest Gwen Humphrey*, in which Judge Tipton first noted that the elements of second degree murder must be proven as a predicate to a finding of guilty of voluntary manslaughter, *id.*, slip op. at 1 (Tipton, J., concurring), and then commented,

> When evidence justifies an instruction on voluntary manslaughter, the trial court should instruct the jury so as to ensure adequate consideration of both second degree murder and voluntary manslaughter. That is, if a sequential offense consideration instruction is given, the instruction dealing with second degree

---

[1](...continued)
One and return your verdict . . . .

You must first deliberate on the greater offense as to each count and reach a verdict as to the greater offense before you move to the next lesser included offense within that particular count. If you reach a verdict as to the guilt of the defendant as to a greater offense you may stop your deliberations as to that count.

murder should also advise the jury relative to the issue of passion upon adequate provocation relative to voluntary manslaughter[,]

*id.*, slip op. at 1-2.

Judge Tipton opined that the problem would be resolved when a trial court instructs the jury, via Tennessee Pattern Instruction – Criminal 7.05(a), that "[t]he distinction between voluntary manslaughter and second degree murder is that voluntary manslaughter requires that the killing result from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." *See* T.P.I. – Criminal 7.05(a) (8th ed. 2004).

The state counters that even Judge Tipton, who *concurred* in affirming the conviction in *Earnest Gwen Humphrey*, agreed that binding precedent allows the use of an instruction for sequential consideration of the homicide grades.

The issue gives us pause because we recognize the potential as did Judge Tipton, that a jury deliberating sequentially on second degree murder might disregard the effect of passion resulting from adequate provocation – even when the record establishes a basis for the claim. We conclude, however, that even if a special rule should be devised for ordering the jury's deliberations on second degree murder and voluntary manslaughter, the present case does not compel relief.

## II. Evidence Sufficiency

In his next issue, the defendant challenges the sufficiency of the evidence convicting him of second degree murder. In his brief, the defendant presents an argument suggestive of provocation via mutual combat, arguing that given the victim's aggression on April 3 and "[g]iven the defendant was aware of the victim's history of armed violence, . . . [the victim's] conduct is precisely the type of provocation contemplated in the definition of voluntary manslaughter."

When an accused challenges the sufficiency of the evidence, the appellate court considers the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979), regardless whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence, *State v. Winters*, 137 S.W.3d 641, 654-55 (Tenn. Crim. App. 2003). The appellate court neither re-weighs the evidence nor substitutes its inferences for those drawn by the trier of fact. *Id.* at 655. The credibility of the witnesses, the weight and value of the evidence, and all other factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). The appellate court affords the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As we mentioned in the preceding section of this opinion, we cannot tell whether the defendant advanced at trial a theory of voluntary manslaughter via imperfect self-defense or mutual combat. Notwithstanding, our task in reviewing the convicting evidence is merely to determine whether the evidence supports the conviction of second degree murder. We conclude that the evidence was sufficient to support the jury's determination that the defendant killed the victim knowingly by firing multiple shots from a pistol at close range. Thus, we do not disturb the jury's verdict.

## III. Denial of Instruction Request

In his last issue, the defendant complains that the trial court erred in denying his request for the following special jury instruction:

> You may consider whether or not a person voluntarily surrendered to the police after the commission of a crime, or after he was accused of a crime, as a circumstance in this case. The presence of flight may tend to establish a consciousness of guilt but this is not sufficient in itself to establish guilt. However, on the other hand, voluntarily surrendering to the police may tend to show that the defendant did not have a consciousness of guilt and this fact alone may be sufficient to create a reasonable doubt as to the defendant's guilt. The weight and significance of these circumstances, if any, are matters for your determination.

The defendant posits that if "flight creates an inference of guilt under the law, [*see, e.g., State v. Kendricks*, 947 S.W.2d 875, 885-86 (Tenn. Crim. App. 1996),] then the converse should also be true."

The defendant's proposition that the trial court erred in rejecting the requested instruction is unsupported by citation to any authority, and for this reason the issue is waived. *See* R. Tenn. Ct. Crim. App. 10(b). In this case, the lack of citation to authority is not just a procedural lapse. The defendant claims that voluntary surrender as a marker of innocence is or should be a facet of Tennessee law; the lack of authority for this position is telling.

Certainly, a trial court has the affirmative duty to instruct the jury on every issue raised by the proof. *See generally Poe v. State*, 370 S.W.2d 488, 489 (Tenn. 1963); *Taylor v. State*, 212 Tenn. 187, 369 S.W.2d 385, 386 (1963). In the present case, we have reviewed the trial court's jury instructions and conclude that the court fully and fairly explained the law applicable to the issues at hand.

## IV. Conclusion

Perceiving no reversible error, we affirm the judgments of the trial court.

-6-

_____
JAMES CURWOOD WITT, JR., JUDGE