IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 22, 2008

## STATE OF TENNESSEE v. TONY E. CANNON, JR.

**Appeal from the Circuit Court for Lincoln County**
**No. S0600080      Robert Crigler, Judge**

---

**No. M2007-00557-CCA-R3-CD - Filed June 19, 2008**

---

A Lincoln County Circuit Court jury convicted the defendant, Tony E. Cannon, Jr., of attempted second degree murder, aggravated assault, and felony reckless endangerment. The trial court merged the conviction of aggravated assault with the conviction of attempted second degree murder and imposed an effective sentence of 12 years in the Department of Correction. In this appeal, the defendant asserts that the evidence is insufficient to support his convictions and that the 12-year sentence imposed for attempted second degree murder is excessive. Discerning no error, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

Hershell D. Koger, Pulaski, Tennessee, for the appellant, Tony E. Cannon, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Charles Crawford, District Attorney General; and Holyn Hewgley and Ann L. Filer, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The events giving rise to the convictions in this case occurred on June 18, 2006, in Fayetteville, Tennessee. The victim, Trenton Dixon, testified that on that day he attended a barbecue in a field next to an abandoned house and then went "riding around" with friends. After a while, the victim became tired and decided to go spend the night with a friend in Huntsville. Before leaving, he parked his car on Robertson Street and went to say goodbye to some of his friends. As he approached the brown house where Randall McClure lived, he saw the defendant and "more than three or four" people, including Kendrick Thomas and Rafael Ford, standing on the porch. At that point, the defendant, whom the victim knew as "Big Man," "came off of the porch . . . straight to [him], like, man don't come down here with that." The victim claimed that he was confused by the defendant's behavior because the two had parted on pleasant terms a few days earlier. The victim

became more confused when the defendant said, "Don't come down here, you and Rio, with that shit." The victim explained, "I don't know why. I was all by myself." When the victim asked the defendant what he was talking about, the defendant repeated, "Don't come down here. I am telling you today ain't the day." The victim stated that "[e]ventually what I got from [the defendant] was for some reason he thought I came down there between whatever him and Rio had going on." The victim explained that "Rio" was Mario Porter, the individual who had hosted the barbecue earlier that day. He stated that he knew Mr. Porter because he worked for the victim's aunt.

The victim recalled that the defendant brandished a handgun during the encounter, and the victim raised his shirt to show that he was not armed. The victim told the defendant, "Chill out. I didn't come down for this man." The defendant "kept on saying what he was saying." At that point, the victim said, "[D]o what you have got to do" and started to walk away, and the defendant shot him twice. The victim recalled that he felt as if his "stomach was on fire" and that "[o]n a scale of one to ten I would say [the pain was] a ten." He fell to the ground and tried to get up but was unable to do so. After the shooting, "[e]verybody scattered. I was left there crawling, trying to get somewhere." After about 30 seconds, an individual named Jason came over and talked to the victim until the ambulance arrived.

The victim was taken by helicopter to Huntsville Hospital where he underwent surgery to remove the bullets and repair the damage to his internal organs. The victim recalled that he lost six inches of his small intestine and that the doctors had to "rebuild [his] digestive tract." The victim remained in the hospital for a week. The victim stated that a piece of one of the bullets could not be removed and that he has a permanent "twitch" that his doctor attributed to "nerves."

During cross-examination, the victim denied that there was bad blood between him and the defendant prior to the shooting. The victim acknowledged that he did not see the defendant fire the first shot but insisted that he had seen the defendant fire the second shot.

Laurel Petty testified that she had known the defendant "[s]ince he was a little child" and the victim "[a] good while." Ms. Petty, who lived across the street from the brown house, was sitting on her porch enjoying the sunny day and the company of a neighbor when she heard the defendant, whom she knew as "Big Man," and the victim "fussing" "in the yard . . .[o]f the brown house." She saw the defendant shoot the victim twice. After the shooting, Ms. Petty went inside her home and did not talk to the authorities. Three days later, she went to the police station and told Detective Eubanks what she had seen. She identified the defendant from a photographic lineup.

During cross-examination, Ms. Petty acknowledged that she took medication for schizophrenia but stated that she had taken her medication on the day of the shooting and was experiencing no problems with her mental health at that time. She insisted that she had a clear view of the shooting and saw the entire event unfold as she sat on her porch. Ms. Petty offered little in the way of explanation for her delay in contacting the police.

Fayetteville Police Department Detective Adam Eubanks testified that he responded to the scene of the shooting and saw the victim "lying on the edge of the driveway" and "yelling that he had been shot." Detective Eubanks tried to talk with the victim at that time, but the victim "was

in a lot of pain and really didn't want to talk." Despite interviewing a number of people who were present at the scene, Detective Eubanks gleaned no information about the identity of the shooter. He explained, "I was told everything from 'I didn't see anything' to '[Y]es, I saw something but I am not telling you.'" Three days later, Ms. Petty came to the police station and identified the defendant as the perpetrator of the shooting. Although Ms. Petty knew the defendant only as "Big Man," Detective Eubanks was familiar with the alias and created a photographic array that included the defendant's photograph. According to Detective Eubanks, Ms. Petty immediately identified the defendant as "Big Man" and showed no hesitation in her identification. The next day, Detective Eubanks visited the victim in the hospital, and the victim provided a statement identifying the defendant as the person who shot him.

Lincoln County Emergency Medical Services worker Joseph Stringfield treated the victim at the scene. According to Mr. Stringfield, the victim stated that he did not know who shot him. On cross-examination by the State, Mr. Stringfield stated that the victim "had two penetrating injuries which confirmed [sic] to be gunshots to the . . . right lower flank region of his back. He was very anxious, in pain."

Rafael Ford, Kendrick Thomas, and Maurice Kelso also testified on behalf of the defendant. Each denied being present when the victim was shot.

At the conclusion of the trial, the jury convicted the defendant of the attempted second degree murder of the victim, the aggravated assault of the victim, and felony reckless endangerment. The trial court ordered that the conviction for aggravated assault be merged into the conviction for attempted second degree murder.

*I. Sufficiency of the Evidence*

The defendant contends that the evidence is insufficient to support his convictions. Specifically, he asserts that there was insufficient evidence of his identity as the perpetrator and that the State failed to establish the necessary elements of felony reckless endangerment. The State submits that the evidence is sufficient to support the convictions.

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). The rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654.

In determining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d

832, 835 (Tenn. 1978). Significantly, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

Criminal attempt is defined as follows:

(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

T.C.A. § 39-12-101(a) (2003). "Second degree murder is . . . [a] knowing killing of another." *Id.* § 39-13-210. "A person commits aggravated assault who . . . [i]ntentionally or knowingly commits an assault as defined in § 39-13-101 and . . . [c]auses serious bodily injury to another; or [u]ses or displays a deadly weapon . . . ." *Id.* § 39-13-103. In this case, the jury, by separate verdict forms, found that the defendant both caused serious bodily injury to the victim and displayed a deadly weapon. "A person commits [the] offense [of reckless endangerment] who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury," *id.* § 39-13-103(a), and "reckless endangerment committed with a deadly weapon is a Class E felony, *id.* at (b).

We need not tarry long over the defendant's claims. The victim, who had known the defendant since early childhood and had even lived with him at one point, testified that the defendant shot him twice. Ms. Petty, who had known the defendant "[s]ince he was a little child," witnessed the entire event and testified that the defendant shot the victim twice. Both the victim and Ms. Petty confirmed that people other than the victim were present during the shooting and within the "zone of danger" created by the shooting. *See State v. Payne*, 7 S.W.3d 25, 28 (Tenn. 1999) (defining the "zone of danger" as "that area in which a reasonable probability exists that the defendant's conduct would place others in imminent danger of death or serious bodily injury if others were present in that zone or area"). Although the defendant presented the testimony of three witnesses who denied being present on the porch of the brown house on the day of the shooting, he offered no proof to contradict the victim's testimony that "more than three or four" people were on the porch or Ms. Petty's

testimony that "[t]here were a lot of people standing around." The evidence is sufficient to support the jury's verdict.

## II. Sentencing

The defendant complains that the 12-year sentence for attempted second degree murder is excessive. He contends that the trial court erroneously applied enhancement factor 10, that the defendant showed no hesitation in committing a crime where the risk to human life was high. *See* T.C.A. § 40-35-114(10) (2006). The State asserts that the application of the factor was appropriate because of the risk to the lives of the bystanders, including Ms. Petty. In the alternative, the State contends that the application of the five unchallenged enhancement factors is sufficient to support the 12-year sentence.

When a defendant challenges the length of a sentence, this court generally conducts a de novo review of the record with a presumption that the determinations made by the trial court are correct. T.C.A. § 40-35-401(d) (2003). This presumption, however, is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The burden of showing that the sentence is improper is upon the appellant. *Id.* If the review reflects the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this court must affirm the sentence, "even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In making its sentencing determination in the present case, the trial court, at the conclusion of the sentencing hearing, was obliged to determine the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and sentencing hearings, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant made in his behalf about sentencing, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-210(a), (b); -103(5); *State v. Holland*, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993).

In setting the sentence for attempted second degree murder at 12 years, the maximum within the range, the trial court applied enhancement factors 1, 6, 8, 9, 10, and 13. *See* T.C.A. § 40-35-114(1), (6), (8), (9), (10), (13) (2006). The defendant contests only the application of enhancement factor 10, complaining that this factor should not have been applied because it is inherent in the offense of second degree murder.

Code section 40-35-114 provides that "[i]f appropriate for the offense and if not already an essential element of the offense, the court shall consider, but is not bound by," a list of statutory enhancement factors. *See* T.C.A. § 40-35-114. "In the case of attempted second degree murder, a high risk to human life will obviously exist," generally making factor 10 inapplicable to a conviction for attempted second degree murder. *See State v. Jerry B. Crow*, No.

01C01-9310-CR-00348, slip op. at 8-9 (Tenn. Crim. App., Nashville, May 11, 1995). This court has held, however, that "enhancement factor (10) may be applied where the defendant creates a high risk to the life of a person other than the victim." *State v. Bingham*, 910 S.W.2d 448, 452 (Tenn. Crim. App. 1995), *overruled in part on other grounds by State v. Hooper*, 29 S.W.3d 1, 9-10 (Tenn. 2000). In this case, the State insists factor 10 is applicable on grounds that the defendant created a high risk to the lives of the bystanders to the shooting. The State's argument, however, overlooks the fact that the defendant was convicted of felony reckless endangerment based upon his conduct in endangering the lives of those standing around when the shooting commenced. Under these circumstances, the trial court should not have applied factor 10 to the conviction for attempted second degree murder. *See State v. Janice Carol Biskner*, No. E2000-01440-CCA-R3-CD (Tenn. Crim. App. Nov. 13, 2001) (holding in a driving under the influence case that "factor (10) is inapplicable predicated on the risk to [d]efendant's son because this was the precise ground for her separate conviction of child endangerment"); *State v. James Edwin Harber*, No. W2000-00462-CCA-R3-CD, slip op. at (Tenn. Crim. App., Jackson, Dec. 27, 2000) (holding in a vehicular homicide case that "the applicability of factor (10) cannot . . . be based on the risk [the defendant's] actions caused to [passengers other than the vehicular homicide victim]" where "the defendant received a separate conviction for reckless endangerment" as to those passengers); *State v. Ricky Williams*, No. E1999-00344-CCA-R3-CD, slip op. at (Tenn. Crim. App., Knoxville, June 15, 2000) ("Although [d]efendant did create a risk to the lives of the two small children in the residence when he committed the reckless homicide, he received a separate conviction for reckless endangerment for the risk he created to the lives of the children. Thus, application of factor (10) was inappropriate.").

The erroneous application of factor 10 notwithstanding, the record fully supports the imposition of the 12-year sentence. At the time of the sentencing hearing, the 20-year-old defendant had four previous convictions of assault, a conviction of possession of cocaine, and a conviction of failure to appear. At the time of the offense, the defendant was on community corrections. The proof at trial established that the victim suffered serious injury, requiring surgery and a lengthy hospital stay, as a result of the gunshot wounds inflicted by the defendant. Moreover, the record establishes that the attack on the unarmed victim was essentially unprovoked.

Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

-6-