IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 3, 2010

**STATE OF TENNESSEE v. LEO MAYS**

**Appeal from the Criminal Court for Shelby County**
**No. 06-03993      John P. Colton, Jr., Judge**

_____

**No. W2008-02215-CCA-R3-CD  - Filed September 17, 2010**

_____

Originally charged with aggravated burglary, aggravated rape, and aggravated assault, the defendant, Leo Mays, was convicted by a Shelby County Criminal Court jury of aggravated criminal trespass and aggravated assault.  The trial court imposed an effective sentence of seven years' incarceration.  In this appeal, the defendant challenges the sufficiency of the convicting evidence.  Finding sufficient evidence to support the verdicts of the jury, we affirm.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

Ruchee J. Patel, Memphis, Tennessee (on appeal); and Juni S. Ganguli, Memphis, Tennessee (at trial), for the appellant, Leo Mays.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; and Rachel Newton, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The convictions in this case relate to the defendant's forcing his way into the apartment of his estranged wife to find her _in flagrante delicto_ with another man.  During the ensuing altercation, the defendant stabbed Garrick Saulsberry one time in the groin.

At trial, Cecil Howard-Mays, the defendant's wife,[1] testified that during the early morning hours of July 21, 2005, she and her boyfriend, Garrick Saulsberry, were asleep in her residence at 3954 Autumn Ridge Court in Memphis when she awoke to find the defendant standing at the foot of the bed wielding what appeared to Ms. Howard-Mays to be an ax. According to Ms. Howard-Mays, the defendant shouted, "You M.F.'s going to die tonight," before swinging the weapon in her direction. She described what happened next, "Garrick jumped in front of me like he was leaning to grab what [the defendant] had, and after I saw that, I ran out the room." Ms. Howard-Mays, who admitted that both she and Mr. Saulsberry were completely naked, testified that she ran into her daughter's bedroom and stayed there until she heard the front door to the apartment close. At that point, she went back into her bedroom to get her cellular telephone, which she took into the bathroom with her and used to call 9-1-1. She stated that just as she concluded the call, the defendant entered the bathroom, threatened her with a knife, and ordered her to lie on the bed. Ms. Howard-Mays testified that she complied with the defendant's order and that he then penetrated her vagina with his penis. She stated that she did not struggle with the defendant or reject his advances, but she insisted that this was only because the defendant threatened her with the knife. Ms. Howard-Mays testified that the police arrived just as the defendant pulled up his pants.

Ms. Howard-Mays testified that the apartment lease was in her name alone and that the defendant did not have her permission to enter the apartment on July 21, 2005. She stated that he did not have a key to the apartment and that they were not romantically involved at the time of the offenses.

During cross-examination, Ms. Howard-Mays admitted that she and the defendant had lived together in the apartment prior to the defendant's being incarcerated in Mississippi for a drunk driving offense. She also admitted that she had withdrawn money from their joint bank account during the defendant's incarceration but that she had not deposited any money into the account. She said that she began dating Mr. Saulsberry, whom she had known for more than 20 years, just after the defendant was incarcerated. Ms. Howard-Mays conceded that the defendant did not drag her from the bathroom into the bedroom. She also conceded that officers arrived at the residence within five minutes of her 9-1-1 call.

Garrick Saulsberry testified that on July 21, 2005, he was asleep in bed with Ms. Howard-Mays when the defendant appeared at the foot of the bed holding a "tire

---

[1] Despite the events in this case and Ms. Howard-Mays's continuing relationship with Mr. Saulsberry, Ms. Howard-Mays had not obtained a divorce from the defendant and remained married to him at the time of the trial.

hammer" that he had taken from the bed of Mr. Saulsberry's truck. Mr. Saulsberry stated that as the defendant swung the tire hammer at Ms. Howard-Mays, Mr. Saulsberry "reached and grabbed it." Mr. Saulsberry recalled that at that point, Ms. Howard-Mays ran from the room and the two men "went to tussling." Mr. Saulsberry explained, "Well, when we started tussling with it, and he felt like I done got it out of his hand in some kind of way. He cut me, and I just felt blood coming running down my leg, so, I knew then I was hurt, and so I just ran outside." Mr. Saulsberry testified that despite the stab wound to his groin, he was able to run out of the apartment into a nearby wooded area, where he hid until the police arrived. He stated that as he lay hidden in the bushes, he saw the defendant discard the tire hammer near a tree.

Mr. Saulsberry testified that he received a combination of stitches and staples to close the wound to his groin and that he stayed in the hospital overnight.

During cross-examination, Mr. Saulsberry stated that he had known both the defendant and Ms. Howard-Mays for a number of years and that he was aware that the two were married. He claimed that Ms. Howard-Mays told him that she and the defendant were going through a divorce and was surprised to learn that the two were still married at the time of the trial. He stated that he and Ms. Howard-Mays were still dating. Mr. Saulsberry conceded that he did not see a knife in the defendant's hand but insisted, "He had to have a knife, because he didn't have the hammer, because I had the hammer in my hand." Mr. Saulsberry stated that the defendant did not chase him from the apartment.

Memphis Police Department Officer Craig Jamerson responded to Ms. Howard-Mays's 9-1-1 call to find that the door to the apartment "had been banged open." Officer Jamerson testified that the defendant answered their knock at the door and that, once they observed blood on the floor, they placed the defendant into custody. Officer Jamerson stated that he found Mr. Saulsberry in a small wooded area behind the apartment and that Mr. Saulsberry was bleeding from a wound to his groin. Officer Jamerson found the tire hammer some 25 to 50 yards from Mr. Saulsberry.

Memphis Fire Department paramedic Chris Crockett, who treated Mr. Saulsberry at the scene, testified that Mr. Saulsberry suffered a stab wound to the groin very close to his penis.

Memphis Police Department crime scene investigator Alpha Hinds testified that she discovered a kitchen knife on the floor of the master bedroom just to the right of the bed. She also photographed the blood on the defendant's clothing.

The State rested, and the defendant presented the testimony of Mitchell Lee

-3-

Williams, who testified that he drove the defendant from Mississippi to the Autumn Ridge apartment in Memphis on the day that the defendant was released from jail in Mississippi. He stated that he and the defendant had been friends for several years and that the defendant was living in the Autumn Ridge apartment with Ms. Howard-Mays prior to his incarceration in Mississippi. Mr. Williams stated that when they arrived at the apartment, he waited in the car while the defendant went to the door, knocked, and was immediately let inside. He said that the defendant did not bang on the door or shout obscenities. Mr. Williams left the defendant at the apartment.

The defendant testified that he and Ms. Howard-Mays had dated for approximately nine years before getting married in 2004 and that he had known Mr. Saulsberry for several years as well. The defendant stated that he and Ms. Howard-Mays began living in the Autumn Ridge apartment in 2001 and that, although his name was not included on the lease, he provided Ms. Howard-Mays with money to pay the rent each month. He testified that after he was incarcerated, he executed a power of attorney to permit Ms. Howard-Mays to withdraw money from his bank account for the purpose of paying the rent. He said that during his incarceration, Ms. Howard-Mays did not write him letters but did place a small amount of money into his inmate trust account.

The defendant testified that on the day he was released from jail, July 7, 2005, his parents picked him up and that he was surprised that Ms. Howard-Mays was not with them. After his parents took him back to their home in Northern Mississippi, he walked to Mr. Williams' house and asked Mr. Williams to drive him to the Autumn Ridge apartment he had shared with Ms. Howard-Mays. He stated that although he was upset that she had not been at the jail to greet him upon his release, he did not bang on the apartment door or shout obscenities at her. He testified that they did, however, argue about Ms. Howard-Mays's withdrawing large amounts of money from his bank account while he was incarcerated. The defendant stated that he left the apartment several hours later on good terms with Ms. Howard-Mays.

The defendant stated that he learned about the affair between Ms. Howard-Mays and Mr. Saulsberry on the following day and that he attempted to confront Mr. Saulsberry about it, but Mr. Saulsberry "took off." He testified that he spoke with Ms. Howard-Mays by telephone that day.

The defendant testified that at approximately 9:00 or 10:00 a.m. on July 20, 2005, Ms. Howard-Mays picked him up near his parents' house and drove him back to a temporary employment agency so that he could fill out a job application. He said that afterwards they returned to the Autumn Ridge apartment, where they stayed for several hours. During that time, Ms. Howard-Mays denied having an affair with Mr. Saulsberry.

-4-

He stated that when Ms. Howard-Mays drove him back to his parents house, he felt as though they were working out their problems. He said that Ms. Howard-Mays had never asked him for a divorce and that they were still married at the time of trial. The defendant testified that he telephoned Ms. Howard-Mays later on that day and that, while talking to her, he a heard man's voice in the background. When he asked her about it, she hung up.

The defendant testified that he then went to a friend's house and began drinking. Sometime later, he asked the friend to drive him to the Autumn Ridge apartment. The defendant stated that by the time they left, he was intoxicated. He recalled that he arrived at the apartment during the early morning hours. When no one answered his knock at the door, the defendant went to the parking lot to look "for something to get in the house with, because nobody would come to the door." He took a tool from the bed of Mr. Saulsberry's truck and used it to break into the apartment. The defendant stated that he walked through the apartment and kicked open the door to the master bedroom. He said, "When I kicked the door open, the victim, Mr. Saulsberry, he jumped up and we tussled." The defendant denied being armed with a knife but admitted cutting Mr. Saulsberry during their altercation. He later stated that he "may have gotten [the knife] when [he] entered the house." The defendant recalled that Mr. Saulsberry, who was not wearing any clothes, ran from the room. The defendant gave chase but could not find Mr. Saulsberry, who had left the apartment. At that point, the defendant discarded the tire hammer behind a tree and returned to the apartment. He admitted finding Ms. Howard-Mays in the bathroom but denied threatening her with a knife or raping her. He stated that the police arrived just as he located her.

During cross-examination, the defendant stated that he did not "remember cutting [Mr. Saulsberry]," but he admitted that Mr. Saulsberry "was injured during the altercation."

On the basis of this proof, the jury convicted the defendant of aggravated criminal trespass as a lesser included offense of aggravated burglary and aggravated assault. The jury acquitted the defendant of the aggravated rape of Ms. Howard-Mays. Following a sentencing hearing, the trial court imposed an effective sentence of seven years' incarceration.

In this appeal, the defendant challenges the sufficiency of the convicting evidence, arguing that the State failed to prove that he did not have permission to enter the Autumn Ridge apartment or that he intentionally or knowingly caused bodily injury to Mr. Saulsberry by the use of a deadly weapon. The State contends that the evidence adduced at trial sufficiently supports each of the convictions. We agree with the State.

We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654.

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[a] person commits aggravated assault who . . . [i]ntentionally or knowingly commits an assault as defined in § 39-13-101 and . . .[u]ses or displays a deadly weapon." T.C.A. § 39-13-103(a)(1)(B) (2003). Code section 39-13-101 provides, in pertinent part: "A person commits assault who . . . [i]ntentionally, knowingly or recklessly causes bodily injury to another." *Id.* § 39-13-101(a)(1).

> A person commits aggravated criminal trespass who enters or remains on property when . . . [t]he person knows the person does not have the property owner's effective consent to do so; and . . . [t]he person intends, knows, or is reckless about whether such person's presence will cause fear for the safety of another.

*Id.* § 39-14-406(a). Aggravated criminal trespass of a habitation is a Class A misdemeanor. *Id.* § 39-14-406(c).

The defendant contends that the State failed to establish the offense of aggravated criminal trespass because it failed to establish that the Autumn Ridge apartment was not the defendant's own residence. The proof adduced at trial, however, established that although the defendant lived with Ms. Howard-Mays at the Autumn Ridge apartment prior to his incarceration in Mississippi, he had not spent a single night at the residence following his release. Indeed, the defendant's parents greeted him upon his release and took him to their residence where he resided until the offenses in this case. The defendant's name was not on the lease, he did not have a key to the apartment, and he did not have permission to

enter, as evidenced by his use of a tire hammer to break into the apartment. The testimony of both Ms. Howard-Mays and the defendant established that although the two were still married even at the time of the trial, they became estranged during the defendant's incarceration and remained so at the time of the offenses. The jury was free to infer from these circumstances that the defendant needed permission to enter the apartment on the night of the offenses and that he did not have Ms. Howard-Mays's permission to break into the apartment using a tire hammer. Moreover, the defendant's wielding the 20-pound weapon in a threatening manner and kicking in the door to the master bedroom was clearly intended to cause both Ms. Howard-Mays and Mr. Saulsberry to fear for their safety.

The defendant also asserts that because no witness affirmatively testified that the defendant stabbed Mr. Saulsberry with a knife, the State failed to establish the offense of aggravated assault. Again, the evidence adduced at trial belies this argument. Although Mr. Saulsberry testified that he did not see a knife in the defendant's hand, he stated that he was, in fact, stabbed in the groin. The defendant admitted that he "may have" procured the knife as he walked through the apartment before kicking in the bedroom door and that Mr. Saulsberry was stabbed during their altercation. During his testimony, the defendant specifically admitted "cutting" Mr. Saulsberry. Police officers discovered a kitchen knife in the area where Mr. Saulsberry was injured. Mr. Saulsberry testified that the stab wound required both staples and stitches and that he spent one night in the hospital. Under these circumstances, the jury was free to infer that the defendant used a deadly weapon to cause Mr. Saulsberry's injury.

Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE