# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### July 27, 2010 Session

## STATE OF TENNESSEE v. JAMES M. RODERICK

### Appeal from the Criminal Court for Bradley County
#### No. 09-174      Carroll L. Ross, Judge

---

### No. E2009-02342-CCA-R3-CD - Filed September 30, 2010

---

A Bradley County Criminal Court jury convicted the defendant, James M. Roderick, of rape, a Class B felony, and the trial court imposed a sentence of 10 years' incarceration to be served at 100 percent as a violent offender. On appeal, the defendant contends that the evidence is insufficient to support his conviction. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

Charles G. Wright, Chattanooga, Tennessee, for the appellant, James M. Roderick.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; R. Steven Bebb, District Attorney General; and Stephen Hatchett, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On March 25, 2009, the Bradley County grand jury indicted the defendant, in count one, for rape "accomplished without the consent of the victim . . . [when] the defendant knows or has reason to know at the time of the penetration that the victim did not consent." *See* T.C.A. § 39-13-503(a)(2) (2006). In an alternative count, the grand jury also indicted the defendant for rape occurring when the defendant "knew or had reason to know that the victim was at the time of the offense mentally defective, mentally incapacitated or physically helpless." *See id*. § 39-13-503(a)(3). The facts concerning the offense involve the 59-year old defendant's sexual penetration of his 18-year old great-niece after an evening of drinking with friends.

In January 2008, the victim was living with her grandmother[1] in Bradley County where she helped care for her grandmother by monitoring her prescription medications, doing household chores, and running errands. Her grandmother's sister, Kathy Roderick, is the defendant's wife. The Rodericks lived nearby, and the victim would assist them with occasional errands. On January 19, 2008, the defendant asked the victim to go with him to the grocery store because he was walking with a cane and could not do the grocery shopping without assistance. The victim went with the defendant and shopped while the defendant waited outside in the car. When they arrived at the defendant's home, the defendant and his wife got into an argument. The defendant asked the victim if she would "go with him" to the home of some friends, Bobby Craig and Dianne Palmore. She agreed, and the two left for the friends' house.

After approximately two hours at the friends' house, Mr. Craig and the defendant decided to go to McDonald's. While they were out, they also purchased a 12 pack of Milwaukee's Best beer. When they returned to the home, Mr. Craig, Ms. Palmore, and the defendant began drinking. Despite being underage, the victim also drank beer and miniature bottles of liquor to the point of intoxication. Likewise, the defendant became too drunk to drive home, so he told the victim that they could sleep there and that he would take her home in the morning. The victim fell asleep on the couch, and the defendant fell asleep in a chair.

The victim testified that, sometime during the night, she awoke to find the defendant on top of her. She testified, "When I went to sleep, I, I opened my eyes and I seen [sic] him on top of me, and . . . he was inside of me." She said, "I don't know if I was in shock or what, but I just, I couldn't move. I couldn't get the strength to move, so I just laid [sic] there." The victim said that she had never experienced problems with the defendant before and that she "looked at him as a grandfather figure."

On cross-examination, the victim reiterated that when she realized what the defendant was doing she "just closed [her] eyes" and "couldn't move." She described her emotional state as being "in complete shock." She said that she tried to scream, but "nothing came out." When the defendant finished, she rolled over and went to sleep. She admitted that she was not mentally defective or mentally incapacitated when the incident occurred. When asked by defense counsel, "Did he rip your vagina up?," she responded that there was no blood from the assault.

---

[1] The defendant made much of an issue over the fact that his sister-in-law was actually the victim's step-grandmother. The victim testified that she always thought of her as a grandmother and that she never really used the term "step" to refer to her grandmother. Because it is of no consequence to our analysis, we will refer to the defendant's sister-in-law as the victim's grandmother.

The next morning, the defendant drove the victim home to her grandmother's house. After several hours passed, she decided to go to the hospital, where a rape kit examination was performed.

Detective Angie Whittemore of the Bradley County Sheriff's Department responded to a report of a rape and met the victim at Sky Ridge Hospital where she observed the collection of the rape kit specimens. She interviewed the defendant who, after executing a waiver of his *Miranda* rights, denied having any sexual contact with the victim. The defendant told Deputy Whittemore that "he was physically unable to do that, due to his medical conditions."

As the investigation progressed, Detective Dwayne Scoggins of the Bradley County Sheriff's Department interviewed the defendant. During the one and one-half hour interview, the defendant provided 17 different accounts of what occurred between himself and the victim. Initially, the defendant claimed that he was asleep on the couch and awoke to find the victim "hunching around . . . on him." He also claimed not to remember if he penetrated the victim. He said that he did not think he was able to have sex, at one point saying, "I don't think it went in." He gave various accounts of discussions about sex that he and the victim had while drinking. He claimed to be drugged by the victim. In other statements he expressed hope that his wife would not find out about his "mistake" and said that he "felt like a child molester because he let it happen." Ultimately, the defendant admitted that he did not know if the victim was asleep when he had sex with her. When asked if she consented, he replied, "No, not really."

Dianne Palmore recalled that the victim made no sexual advances toward the defendant. She denied that the victim took off her pants. However, she did recall that the defendant asked the victim if she wanted to sit in the chair with him. Ms. Palmore said this seemed to make the victim feel uncomfortable, so Ms. Palmore told the defendant that the victim was fine sitting next to her. She admitted that the men drank beer that night, but she denied that there was any liquor in the house. She said that she only saw the victim drinking Coke. The defendant and the victim left her home at approximately 8:00 a.m., while she and Mr. Craig were still in bed. She heard the door close when they left. She acknowledged that she never heard any protest or screaming during the night.

On January 19, 2008, Bobby Craig invited the defendant and his wife to spend the night at his home because the couple had experienced problems with their heat. Mr. Craig was surprised when the defendant arrived instead with the victim. He did not see the victim drink beer or liquor that night. He did not see the victim remove her pants that night. He did not hear the defendant claim that he had been drugged that night. He witnessed no flirting between the defendant and the victim. Both men drank beer that night, but Mr. Craig

claimed that the victim drank only Coke. Before Mr. Craig went to bed that night, the victim had made a bed on the couch, and the defendant was sitting in a chair.

Tennessee Bureau of Investigation Special Agent Lisa Wessner, an expert in serology and deoxyribonucleic acid (DNA) analysis, performed testing on the defendant's swab and the rape kit evidence collected from the victim. The testing confirmed the presence of sperm in the victim's underwear and vaginal swab. DNA testing revealed a match of the defendant's swab to the evidence found in the underwear. Analysis also confirmed that the defendant was a minor contributor of DNA found on the vaginal swab.

The defendant suffered from numerous health problems including chronic lung disease, knee and hip problems, hearing impairment, carpal tunnel, restless leg syndrome, acid reflux, and sleep apnea. He claimed that double hernia surgery in 2003 or 2004 "just left [him] with no sex life." He said that these health problems rendered him impotent. He tried Viagra in 2004, but it made him sick.

The defendant said that on January 19, 2008, his wife's sister – the victim's grandmother – asked the defendant to take the victim grocery shopping, so the defendant drove the victim to the grocery store while the victim did the shopping for her grandmother. After delivering the groceries to the victim's grandmother, the victim assisted the defendant with his grocery shopping. When they brought the groceries to the defendant's home, the defendant's wife told the victim that she needed to get home to care for her grandmother. The defendant claimed that the victim "just didn't act like she liked" what the defendant's wife had told her. She asked the defendant if there was someplace the two of them "'could go hang out for a while.'" The defendant suggested going to Mr. Craig's house.

Once they arrived at Mr. Craig's house, Mr. Craig and the defendant went to McDonald's and to a store for beer. The defendant said that the victim drank only Coke. He recalled that the victim asked Mr. Craig for a beer but that Mr. Craig refused to give her one because of her age. The defendant also said that the victim removed her pants at one time during the evening, but Mr. Craig told her to put them back on.

The defendant claimed that either the victim or Ms. Palmore brought him an opened beer, and, after taking "a drink or two of it," the defendant commented that the beer did not "'taste right.'" The defendant said that he began to feel sick after drinking only one and one-half beers. At approximately 11:00 p.m., Mr. Craig made him "a pallet" on the couch so he could go to sleep. Due to his sleep apnea, he slept partially sitting up on the arm of the couch.

The defendant said that he awoke at approximately 3:00 a.m. to find the victim

-4-

"trying to do oral sex on [him]." Despite his claims that he was a happily married man and was physically unable to be aroused, the defendant said that "the next thing I knowed [sic], she was up astraddled [sic] of me." The defendant said that he did not "know if [the victim had] put [his penis] in her or not." He claimed that he "pushed her off and made her get down on the floor." The defendant fell asleep but awoke to take the victim home at approximately 6:00 a.m. When he returned home, he was sick and told his wife that he thought he had been drugged.

The defendant testified that he was illiterate and that "[he] can read to some extent, but most things [he] can't read." On cross-examination, he acknowledged passing the commercial driver's licensing test but claimed that he cheated on the test. The defendant identified his own hand-written account of the incident which showed he had some writing and spelling ability. He admitted that he told Detective Whittemore that the victim was drunk. Despite his claim that he was "too sick to get out of bed" for three days following the incident, he acknowledged that he never sought medical treatment for the alleged drugging of his beer. The defendant insisted that the victim initiated the sexual contact. When asked by the assistant district attorney general if the victim raped him, the defendant replied, "That's what it looks like to me . . . because I, really, I was laying on the bottom and she got on top of me."

Kathy Roderick, the defendant's wife, testified that the couple had been married for 36 years. She recalled that the defendant drove the victim to the grocery store to shop for her sister, the victim's grandmother. The victim also assisted the defendant with grocery shopping because Mrs. Roderick was home sick with a "cluster migraine." Mrs. Roderick said that she and the victim argued about putting the victim's grandmother in a nursing home. She also claimed that the victim had moved from Ohio because of problems with her mother and step-father. Mrs. Roderick testified that the victim and the defendant went to Mr. Craig's house to retrieve a chainsaw. She said that there were no problems with the heat at their home and that she expected the defendant to come home after getting the chainsaw.

Regarding the defendant's ability to perform sexually, Mrs. Roderick said that his health problems made sex "just too much on him" and that even Viagra made him "sick at his stomach." She said that she and the defendant had not had sex in "approximately six years" and that "he tried but he couldn't." In light of this, she could not understand how his semen was found on the victim.

Based upon this evidence, the jury convicted the defendant, in count one, of rape without consent. In count two, the jury acquitted the defendant of rape accomplished when the victim was "mentally defective, mentally incapacitated or physically helpless." At sentencing, the trial court imposed a sentence of 10 years' incarceration.

The defendant contends that the evidence is insufficient to support his conviction of rape. Specifically, he contends that "the record is <u>completely</u> devoid of any evidence that defendant, James Roderick, knew or had reason to know that the alleged victim did not consent." In support of this contention, he argues that the victim must have been sexually aroused because she suffered no vaginal injuries; that "[a] frightened and non-consenting victim would not just be neutral for 20 minutes during intercourse . . . ., [and] [t]he alleged victim's vagina would not be lubricated"; and that "[w]hen one is frightened one does not just roll over and go to sleep." The State argues that the evidence showed the victim's lack of consent, as well as the defendant's knowledge of lack of consent.

We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S. Ct. 2781, 61 L. Ed.2d 560 (1979); *State v. Winters,* 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters,* 137 S.W.3d at 654.

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id*. at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id*.

As relevant to this case, "[r]ape is the unlawful sexual penetration of a victim by the defendant . . . accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent." *See* T.C.A. § 39-13-503(a)(2).

We see no point in belaboring our analysis of the defendant's specific arguments. In the light most favorable to the State, the evidence showed that the victim awoke to find the defendant on top of her, having already penetrated her vagina with his penis. Frightened and "in shock," she closed her eyes and pretended to be asleep. After the defendant ejaculated and left the victim, the victim rolled over and went to sleep. The next day, she went to the hospital where a rape kit examination was performed. DNA analysis of her underwear and the rape kit showed the presence of the defendant's semen in her vagina. As for the defendant, he gave Detective Scoggins no less than 17 different statements concerning his role in the offense. These explanations ranged from an adamant denial of any

sexual contact with the victim to blaming the victim for initiating the contact. The defendant ultimately admitted to Detective Scoggins that the victim did not consent. At trial, the defendant claimed that the victim raped him. The jury chose to accredit the testimony of the victim and the State's witnesses. The evidence is sufficient to support the defendant's conviction of rape occurring without consent. The judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE