# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 7, 2011

## STATE OF TENNESSEE v. STANLEY BUTLER

**Appeal from the Criminal Court for Shelby County**
**No. 08-03862    Mark Ward, Judge**

**No. W2010-01514-CCA-R3-CD  - Filed July 20, 2011**

A Shelby County Criminal Court jury convicted the defendant, Stanley Butler, of three counts of aggravated assault, *see* T.C.A. § 39-13-102(a)(1)(B)(2006), for which he received a total effective sentence of five years to be served on split confinement consisting of 12 months' confinement in the local workhouse followed by probation.  On appeal, the defendant contends that the evidence is insufficient to support his conviction for aggravated assault only in count two.  Discerning no infirmity in the evidence, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Charles Waldman, Memphis, Tennessee, for the appellant, Stanley Butler.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; William L. Gibbons, District Attorney General; and Summer Morgan and Nicole Germain, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

On November 4, 2006, Robert Caston struck the defendant's vehicle while traveling through the parking lot of the New Horizon apartment complex in Memphis. Following a brief verbal exchange between the defendant and Mr. Caston outside their vehicles, Mr. Caston returned to his vehicle, backed up approximately one foot, and began to move away from the accident scene.  The defendant, an off-duty security guard, drew his .45 caliber automatic handgun and fired two shots into the front windshield of the vehicle. As Mr. Caston passed, the defendant fired one more shot into the rear window of Mr.

Caston's vehicle. Both Mr. Caston and one of his passengers, ten-year-old J.D.,[1] were struck by bullets and received treatment at local hospitals within minutes of the shooting. Another passenger, Dakota Dunlap, was not injured.

Robert Caston drove a friend, Dakota Dunlap, and her son, J.D., to their new apartment on the morning of November 4, 2006. After Ms. Dunlap spent a brief amount of time "straighten[ing] up," she asked Mr. Caston to drive them around the parking lot to show J.D. where he could "cut through" to a walkway leading to his school. Mr. Caston drove, with Ms. Dunlap seated in the front passenger seat and J.D. seated behind her on the passenger side in the backseat. As he rounded a corner in the parking lot, Mr. Caston "struck [the defendant's] vehicle."

Mr. Caston recalled that the defendant got out of his vehicle and immediately became "kind of hostile." Mr. Caston told the defendant that he was going to move his vehicle because traffic had begun to back up near the accident. He said, "As I was getting back in the car, shots rang out and I just tried to get away." He backed up the vehicle and then turned to the left, away from the defendant, to leave the parking lot. Ms. Dunlap told him to stop, but he kept driving to escape the shooting. Mr. Caston and Ms. Dunlap soon realized that J.D. had been shot on his left shoulder and left side, so Mr. Caston drove to the nearby home of Ms. Dunlap's mother, where Ms. Dunlap called an ambulance. Ms. Dunlap became impatient with the ambulance service and ultimately drove J.D. to LeBonheur Children's Hospital, where he was treated for his wounds. After delivering Ms. Dunlap and her son safely to Ms. Dunlap's mother's home, Mr. Caston realized that he had also received a gunshot wound to his arm. He went to the home of his brother who drove him to Methodist South Medical Center.

Mr. Caston said that he never threatened the defendant, that he did not have a gun, and that he did not attempt to strike the defendant with his vehicle. The front windshield of his vehicle had two bullet holes, and the back window was "completely shattered." On cross-examination, Mr. Caston admitted that he was driving without a valid driver's license, but he contended that the only reason he left the scene was to escape the shooting.

Dakota Dunlap recalled that Mr. Caston drove her and her son to her new apartment, where she "[p]ut some stuff in [the] apartment," and that Mr. Caston "was going to show [her] a short-cut [for J.D.] . . . to get to school." She recalled that Mr. Caston "ran into the back of the [defendant's] truck" and that they "never made it to the spot." The men talked outside their vehicles, but Ms. Dunlap did not hear them arguing. Mr. Caston returned

---

[1] It is the policy of this court to refer to child victims only by their initials.

to his vehicle to move it out of the way of traffic. Ms. Dunlap recalled seeing that "the guy pulled the gun from the holster" and "just started shooting" before Mr. Caston even put the vehicle in gear. Mr. Caston pulled away while the defendant continued to shoot.

They soon realized that J.D. was injured. Although J.D. did not require surgery, the doctors told him that he was "lucky" because one bullet struck him in his back and exited his chest approximately four inches from his heart. Ms. Dunlap was not injured in the shooting.

Ms. Dunlap said that Mr. Caston did not try to hit the defendant with his vehicle and that he was actually turned to the left, away from the defendant, when he began to move forward. She said that she "never understood why anything happened" because the men did not argue and Mr. Caston did not threaten the defendant in any way. She testified that the defendant "just pull[ed] out a gun . . . and just sh[ot] for no reason at all."

J.D. recalled that Mr. Caston had driven him and his mother to their new apartment and was driving through the parking lot to show them a short-cut to school when he hit the defendant's vehicle on the passenger-side rear bumper. J.D. stayed inside Mr. Caston's vehicle while the men talked for approximately three minutes. Mr. Caston returned to the vehicle and told J.D. and Ms. Dunlap that the defendant had started cursing. As Mr. Caston backed up to let other drivers through the intersection, the defendant "jumped in front of the truck and started shooting." The defendant shot through the front windshield and, as Mr. Caston turned to the left, the defendant shot through the back window. Two bullets struck J.D. on his left side and left arm. J.D. testified that Mr. Caston did not drive toward the defendant at any time.

Angelesa Holmes, an apartment resident, was out walking with her son when she saw "the little fender bender and the shooting." She described the defendant as "teed off" because the accident was Mr. Caston's fault. It was clear to Ms. Holmes that the defendant "was very upset" by Mr. Caston's "nonchalant attitude." As Mr. Caston began to drive away from the defendant, the defendant began shooting. Ms. Holmes was surprised that someone would shoot because there were "kids out [t]here" in the apartment complex parking lot. She reiterated several times during her testimony that Mr. Caston never drove toward the defendant and that the defendant was not in danger at any time.

Memphis Police Department (MPD) patrol officer Darryl Mattison responded to the call of a shooting at New Horizon apartment complex on the morning of November 4, 2006. He arrived to a "chaotic"scene of multiple individuals out in the parking lot wanting to report what had occurred. While he secured the scene, his partner located the defendant, who was waiting near the apartment complex leasing office for the officers' arrival. Mr.

-3-

Caston's vehicle was not at the scene. Officer Mattison found no debris on the road from the accident. He explained the MPD's use of force policy at trial and said that a progressive escalation of force must occur before deadly force may be used. He also noted that when others may be harmed by the use of deadly force, officers were trained to "de-escalate" their use of force. He said, however, that he would fire on a moving vehicle if he felt threatened.

MPD Sergeant Barnabus Bradley spoke to the defendant at the scene. He recalled that the defendant was dressed in a security guard uniform and had a holstered weapon at his side. The weapon was registered to the defendant via a properly issued permit. The defendant admitted firing his weapon at Mr. Caston. He told Sergeant Bradley that when Mr. Caston tried to leave the scene of the accident, Mr. Caston's vehicle grazed his leg so he shot at the vehicle out of fear for his life. Sergeant Bradley discerned no injury to the defendant's leg, and the defendant did not request medical treatment at the scene.

MPD Detective Byron Braxton provided the defendant with *Miranda* warnings and, following the defendant's waiver of his rights, interviewed the defendant. The defendant told Detective Braxton that he and Mr. Caston engaged in a "heated exchange" concerning the accident. Although he first "thought maybe [Mr. Caston] was just going to move his vehicle," the defendant "got a funny feeling" and "drew his weapon." The defendant said that Mr. Caston "accelerated" toward him as he shot two times. Mr. Caston "grazed [the defendant's] knee" with his vehicle. The defendant fired one more shot as Mr. Caston drove away from the parking lot. He said that he fired his gun to stop Mr. Caston from leaving the scene. The defendant told Detective Braxton that he saw only two people in the vehicle and that he would not have drawn his weapon had he known a child was in the backseat.

Detective Braxton testified that the law does not allow someone to draw a weapon to prevent another person from leaving the scene of an accident. He also said that the defendant's weapon, a "Heckler and Kotch" automatic handgun, held nine rounds when fully loaded. He opined that, assuming Mr. Caston drove toward the defendant, the first two shots fired by the defendant could have been in self-defense. He further testified, however, that the third shot fired as Mr. Caston exited the parking lot was not shot in self-defense. Detective Braxton said that the defendant did not appear to be injured.

The defendant presented the testimony of his fiancée, Lilian Hernandez. She testified that the defendant had given her a ride to work on the morning of November 4, 2006. As they drove near the apartment complex leasing office where she worked, someone struck the rear passenger side of the defendant's vehicle. She said that as the men spoke briefly, the other driver "pac[ed] back and forth." The other driver then hurried to his truck and drove away quickly. Although Ms. Hernandez did not see the vehicle strike the

defendant, she did see the defendant holding his leg because he had been hit. Furthermore, although she did not see any gunshots, she heard three gunshots as the other driver left the scene. Ms. Hernandez admitted telling the police that she wished the defendant had not fired his gun and that they had just called the insurance company and paid the deductible.

The defendant testified that in November 2006 he was employed as a security guard with Dynamic Security. In the course of his employment, he completed "high risk environment training," which he described as "personal body guard" training, and also "regular security training." As a consequence, the defendant was licensed to carry a handgun and had a valid permit to do so.

On November 4, 2006, the defendant worked the 11 p.m. to 7 a.m. shift as security at a local Pilot gas station. He then picked up his girlfriend, Lilian Hernandez, to give her a ride to work at the New Horizon apartment complex. As the defendant drove toward the leasing office of the apartment complex, another man hit his vehicle. The defendant, who had the right of way, approached the other man and said, "'Doc, did you not see us coming?'" to which the other man replied, "Yeah." The defendant testified that the other man then went back to his vehicle and "didn't look like . . . he wanted to even talk to [him]." When the other man returned to his vehicle, it appeared to the defendant that the man began "fussing" with a lady in the passenger seat. The other man then backed up his vehicle and pulled forward. The defendant pulled his weapon because the man was "turned straight at [him]." The defendant shot two rounds. As the other man moved the vehicle forward and turned to the left, his right front bumper grazed the defendant's leg and caused the defendant to fire another shot. The other man then drove away.

The defendant testified that he telephoned 9-1-1 and waited for the officers to arrive. He said that he only fired his gun because he "thought that [Mr. Caston] was going to run over [him]." Because Mr. Caston's windows were tinted, he could not see in the backseat of the vehicle and did not know that a child was in the vehicle. The defendant said that he would never have "[p]ut a kid's life in danger." He also said that he did not intend to hurt or kill anyone but that he "was in fear of [his] life." He received treatment for muscle spasms in his leg the following day. He also surrendered his handgun permit and license.

On cross-examination, the defendant maintained that he pulled his gun to make Mr. Caston veer away from him or stop. Although acknowledging that he aimed at the vehicle each time he fired the gun, the defendant claimed that the third shot was a "reflexive" shot in response to Mr. Caston's car grazing his leg. He acknowledged that it was a crime to pull his gun to prevent someone from leaving the scene of an accident. He also conceded that he aimed his gun at the car with knowledge that people were in the car and that any bullets from the gun would go where aimed.

Based upon this evidence, the jury convicted the defendant of three counts of aggravated assault. At sentencing, the trial court imposed concurrent five-year sentences of split confinement consisting of the service of 12 months' incarceration in the local workhouse followed by a term of probation. On appeal, the defendant does not contest the sufficiency of the evidence to support his convictions in counts one and three, relating to the aggravated assaults of Mr. Caston and Ms. Dunlap. He does, however, contend that the evidence is insufficient to support his conviction of the aggravated assault of J.D. because he did not know J.D. was in the vehicle at the time he fired his weapon.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654.

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id*.

Aggravated assault, as is applicable in this case, occurs when someone "[i]ntentionally or knowingly commits an assault as defined in § 39-13-101 and . . . [u]ses or displays a deadly weapon." T.C.A. § 39-13-102(a)(1)(B). Assault is defined by our Code as "[i]ntentionally, knowingly or recklessly caus[ing] bodily injury to another" or "[i]ntentionally or knowingly caus[ing] another to reasonably fear imminent bodily injury." *Id*. § 39-13-101(a)(1) and (2).

In this case, the defendant knowingly fired his weapon three times into Mr. Caston's vehicle. Each time he fired his weapon, the defendant aimed at either the front windshield or the back window. Bullets from the defendant's gun struck both Mr. Caston and J.D., causing bodily injury, and Ms. Dunlap was in fear of imminent bodily injury by the defendant's shooting. The jury rejected the defendant's claim of self-defense. Furthermore, the defendant admitted that he fired his weapon into the vehicle with a knowledge of Mr.

Caston and Ms. Dunlap's presence in the front seat. The defendant's particular knowledge of J.D.'s presence in the vehicle is immaterial to his conviction. *See State v. Kenneth Edward Holsapple*, No. M2006-01683-CCA-R3-CD, slip op. at 5 (Tenn. Crim. App., Nashville, July 5, 2007) (noting that aggravated assault does not require intent to assault a specific victim so that conduct directed toward an intended victim may support a conviction regarding that same conduct directed toward unintended or unknown victims); *State v. Craig Bryant*, No. 02C01-9707-CR-00286, slip op. at 17 (Tenn. Crim. App., Jackson, Jan. 8, 1999) (holding evidence sufficient to support the defendant's conviction of aggravated assault of drive-thru attendant when defendant "entered his wife's car with a loaded gun, pointed the gun at his wife, and fired the gun while the car was beside the drive-thru window"). Accordingly, we conclude that the evidence is sufficient to support the defendant's convictions in this case.

*Conclusion*

Discerning no paucity in the evidence to support the defendant's convictions of three counts of aggravated assault, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE